UNITED STATES of America,
Plaintiff-Appellee,

v.

Gennaro J. ORRICO,
Defendant-Appellant.

No. 78–5210.

United States Court of Appeals,
Sixth Circuit.

Argued Dec. 7, 1978.

Decided May 9, 1979.

Bernard A. Berkman, Berkman, Gordon, Kancelbaum & Levy, Cleveland, Ohio, for defendant-appellant.

James R. Williams, U. S. Atty., Cleveland, Ohio, Deborah Watson, T. George Gilinsky, Washington, D. C., for plaintiff-appellee.

Before ENGEL, Circuit Judge, PECK, Senior Circuit Judge, and DeMASCIO, District Judge.*

JOHN W. PECK, Senior Circuit Judge.

The defendant Gennaro Orrico was convicted on two counts of violating 18 U.S.C. § 2314. Specifically, he was charged with having caused the transportation of certain checks in interstate commerce, knowing them to have been converted and taken by fraud. We reverse and remand for entry of a judgment of acquittal, having concluded that insufficient evidence was introduced to sustain the verdicts of guilty.

*The Scheme:* All the events surrounding the challenged activity occurred in 1972 and early 1973, nearly seven years ago, and a full five years before trial. This unexplained time lag created many of the problems in this case.

Globe Capital was a holding company that held shares in a variety of other insurance-related companies, including Globe Assurance and Globe Agency. Tom Bosse, Harold Franklin and Mort Franklin were the principal shareholders in Globe, and were all partners in Schreiber, Bosse & Co., a brokerage firm. Bosse served as consultant to Globe, Harold Franklin was president and chairman of the board, and Mort Franklin served as executive vice-president.

In 1972, Globe was undercapitalized and under pressure from the State of Ohio In-

* Honorable Robert E. DeMascio, United States District Judge for the Eastern District of Michigan, sitting by designation.

surance Board to improve its financial position by additional investments of at least $200,000. Insofar as can be gleaned from a sparse record, Globe's major shareholders came up with a scheme to improve Globe's position on paper without actually investing any additional capital.

At the time, an Illinois company was acting as Globe's agent in Illinois, selling credit life insurance and periodically remitting premium payments to Globe after deducting its commissions and expenses. Globe had also created Metro Insurance Service to sell credit life insurance for it in Ohio. Globe and Metro were closely linked, sharing personnel, with Globe paying the salaries of some Metro officers. The scheme devised by Bosse and the Franklins was fairly simple; a series of checks coming from Illinois to Globe were diverted into Metro's checking account, the funds then used to purchase savings certificates, and these were in turn used as collateral for personal loans to Globe directors and officers for reinvestment in the company.[1]

*The Evidence against the Defendant:* The question of what the defendant had to do with all of this is a natural one. It is undisputed that there is no reference to him in any of the documentary evidence amassed by the Government. He did not deposit the checks, sign for, authorize or receive any of the loans. He was neither a major shareholder nor a director of Globe.

At oral argument, the Government conceded that nothing in the record indicated he had benefited in any way from the alleged conversion, and indeed, there was testimony that the assistant U.S. attorney who tried the case described him as the "patsy" for the Franklins and Bosse.

Orrico was a production manager in charge of the credit life division of Globe. The Government's theory of the case is that Orrico authorized the Metro bookkeeper, Rose Kennedy, to deposit two Globe checks to Metro's account, and later told Metro's president, Robert Jones, to endorse another Globe check to Metro's account. In this way, the Government argues, Orrico "caused" the deposit of funds, resulting in their movement in interstate commerce as they were processed through normal banking channels.[2]

The bank records introduced at trial indicate that two Globe checks were deposited in Metro's account in July, 1972, by Rose Kennedy. Quite naturally, at the time of trial, Kennedy remembered nothing of the transaction. However, approximately a year after the deposit of the checks, in the course of its investigation, the Ohio Department of Insurance prepared a statement which Kennedy signed, and this statement was offered and received at Orrico's trial as her past recollection recorded, pursuant to Fed.R.Evid. 803(5).[3] The *only* evidence of

---

1. The Government's position is that the deposit of the funds into Metro's account, for a fraudulent purpose, constituted a conversion, and no one seems to have questioned the fact that a conversion occurred. Therefore, for the purposes of this appeal, we accept as a premise that the funds were converted. However, legal or not, it is difficult to see how this circle of funds constitutes a conversion, since it appears that at all times the Globe funds were being utilized by Globe officers to enable Globe to continue doing business in Ohio. Proof of a conversion would require a showing that Globe at some point had been wrongly deprived of the use of its funds.

This version of how the funds were used, and for what purpose, is derived from Bosse's testimony on behalf of the defendant. Very little is in the record concerning the scheme, however, because the district judge considered the mechanics of and the motivation for the diversion of funds to be irrelevant to the charge. The

Government did not dispute Bosse's version of the scheme, except insofar as Bosse testified that the defendant was not involved.

2. Since we conclude that the evidence was insufficient to prove that Orrico "caused" the deposit of the funds, we do not reach the further difficult issue of the adequacy of proof of knowledge that the funds had been converted and taken by fraud.

3. Fed.R.Evid. 803(5), Past Recollection Recorded, is one of the exceptions to the general rule barring the use of hearsay testimony. The Rule provides that if a witness cannot remember an event sufficiently to testify fully about it, but made a written memorandum of the event "shown to have been made or adopted by the witness when the matter was fresh in his memory and to reflect that knowledge correctly," the memorandum or statement itself is admissible.

the defendant's involvement, in any way, in the deposit of the two checks, is contained in one sentence of that statement. After stating that she had been sent to Bosse's office by either Mort Franklin or Robert Jones, the statement goes on:

I then recall Mr. Bosse giving me two checks for deposit to the Metro account at the Northern Ohio Bank. I remember questioning this deposit because neither of these checks for deposit were drawn to the order of Metro Insurance Services, Inc. *Mr. Bosse then called Mr. Gennaro Orrico and Mr. Orrico told me over the phone to go ahead and endorse the checks anyway because Metro was acting for the payee.*

The evidence that the defendant "caused" the deposit of an additional check a few months later by Metro's president, Robert Jones, is not much stronger. There was evidence that a few days before the check was deposited, Orrico discussed with the bank president the collateral which would be necessary to secure a loan to Schreiber, a partner of Bosse and the Franklins. Subsequently, Jones testified that he deposited the Globe check to Metro's account, and the funds were once again used to purchase certificates of deposit and in turn as collateral for a loan. Jones also testified that the defendant was at the bank at the time the deposit was made, but could not remember whether the defendant had accompanied him to the bank or whether the defendant was there on other business. When Jones testified that he did not remember who told him to deposit the checks, the Government attempted to impeach his lack of memory with alleged grand jury testimony, during which Jones had stated that the defendant told him to endorse the check.

Some months after the two transactions, the defendant stated at a meeting of Globe officers that the missing funds had been used to purchase certificates of deposit. While this evidence might indicate a knowledge of the scheme (indeed, the defendant testified that by this time everyone in the company knew about it), it does not shed any light on the crucial question of whether the defendant *caused* the deposit of the checks. After a careful study of the entire record, we are unable to discover any evidence whatsoever, other than Kennedy's written statement and Jones' prior inconsistent testimony, that Orrico was involved in the deposit of the funds.

*Sufficiency of the Evidence:* We decide the issue of sufficiency of the evidence, rather than admissibility, because the former issue is determinative of the question whether Orrico may be retried. *Burks v. United States,* 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978) (reversal for insufficient evidence requires acquittal). Admissibility of Kennedy's statement is not an easy issue, even given the trial judge's broad discretion in admitting evidence. Her statement was given over a year after the deposit of the checks, and displays considerable hesitancy about details. It would be difficult to conclude that the events were "fresh in her memory," however flexible that standard may be. Furthermore, the necessary foundation for admitting an opinion as to the identity of a speaker over the telephone was not laid within the statement itself, and at the time of trial, Kennedy was unable to remember anything about her familiarity with Orrico's voice when the conversation took place.

As for Jones' testimony, it appears that though it may have been admissible as a prior inconsistent statement given under oath, through some oversight, the necessary foundation for admitting it as substantive evidence was never laid, and the testimony was used solely for impeachment. Since this could be readily remedied at a new trial, we decide the more fundamental issue of sufficiency of the evidence.

The fundamental guidelines to be observed in considering the sufficiency of the evidence to support a criminal conviction are well-established. Our general hesitancy to disturb a jury verdict applies with even greater force when a motion for acquittal has been thoroughly considered and denied by the trial judge, as occurred here. Furthermore, once there has been a conviction in a criminal case, appellate courts are

bound to view the evidence in the light most favorable to the Government, drawing all reasonable inferences consistent with the verdict. *United States v. Green,* 548 F.2d 1261 (6th Cir. 1977). Nevertheless, there must be substantial evidence as to each element of the offense from which a jury could find that the accused is guilty beyond a reasonable doubt. As this Court reiterated in *Green:*

> Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept to support a conclusion. It is evidence affording a substantial basis of fact from which the fact in issue can be reasonably inferred.

*Id.* at 1266.

The two statements relied upon to prove that Orrico caused the deposit of the checks, though admitted pursuant to separate exceptions to the hearsay rule, are similar in that in both cases, the declarant was under oath and on the stand, but remembered nothing of the crucial events about which testimony was sought. Therefore, the statements were offered as substitutes for the testimony which presumably would have been provided if the witness had been able to remember the events. Under these circumstances, while Orrico may have been physically confronted with the witnesses against him, cross-examination was, for all practical purposes, impossible. He could not probe Kennedy's memory of the meeting at Bosse's office; she did not remember it at all. He could not challenge her identification of him as the person who authorized her over the phone to endorse the check; she could not remember if she could recognize his voice. While there were at least four persons from whom she took orders, it was impossible to cast doubt on her memory of him as the person to whom she spoke that day. Furthermore, the exact words used to "authorize" her to deposit the checks were crucial, but it was impossible at trial to reconstruct exactly what was said. As for Jones' prior inconsistent testimony, the defendant's problems were slightly different. Jones generally remembered the transaction, but testified that he could not remember who told him to deposit the check. The Government was allowed to impeach its witness's lack of memory by introducing grand jury testimony to the effect that the defendant had given him his instructions, but then the defendant was barred from "impeaching the impeachment" with even earlier testimony at the Department of Insurance hearing that it had probably been either Mort Franklin or the defendant who told him to deposit the check. The district judge ruled that the two prior statements were not inconsistent. The defendant was faced with a Government witness who had given wavering, somewhat inconsistent versions of his story in the past and who now professed to remember nothing, so the truth of the matter could be pursued no further.

Our concern in this case focusses on the fact that the central element of the crime with which the defendant was charged was established entirely through the use of out-of-court statements, made at a time when the defendant had no opportunity to cross-examine the witnesses as to the accuracy of their accusations. At common law, this case would have been simple. Neither statement would have been admissible as substantive evidence of defendant's guilt; Kennedy's statement would have been barred because it was not made at or near the time of the event in question, and Jones' prior inconsistent statement could have been used only for impeachment purposes, not as substantive evidence. The Federal Rules of Evidence changed those old rules, in preference for a very broad standard of admissibility with the goal of placing all relevant evidence before the trier of fact. The old requirement of a contemporaneous writing was dropped in favor of admissibility so long as the events were fresh in the witness's mind when the statement was recorded, and prior inconsistent statements were made admissible so long as they were made under oath.

■ The possibility of a case arising in which the Government attempted to make its case entirely based on such evidence,

previously inadmissible, was foreseen. While the new Rules were under consideration by Congress, objection was made that admitting prior inconsistent statements as substantive evidence raised the possibility that a person might be convicted solely upon such evidence. The Senate Committee responded:

> It would appear that some of the opposition to this Rule is based on a concern that a person could be convicted solely upon evidence admissible under this Rule. The Rule, however, is not addressed to the question of the sufficiency of evidence to send a case to the jury, but merely as to its admissibility. Factual circumstances could well arise where, if this were the sole evidence, dismissal would be appropriate.

S.Rep.No.93–1277, 93rd Cong., 2d Sess., reprinted in 1974 U.S.Code Cong. & Admin. News, pp. 7051, 7063 n. 21. In his treatise on the Federal Rules, Judge Weinstein comments:

> Rule 801(d)(1)(A) [admitting prior inconsistent statements as substantive evidence] will theoretically enable a party to make out a prima facie case even if his only evidence is a previous inconsistent statement of this type. Under the orthodox rule, "if the only evidence of some essential fact is such a previous statement, the party's case falls."
>
> It is doubtful, however, that in any but the most unusual case, a prior inconsistent statement alone will suffice to support a conviction since it is unlikely that a reasonable juror could be convinced beyond a reasonable doubt by such evidence alone.

4 Weinstein's Evidence 801–74. We can conceive of such an "unusual case," where, for example, a purely technical element of a crime is established solely through a prior

inconsistent statement or a past recollection recorded, such as establishing that stolen property was worth a certain amount or that it had moved in interstate commerce at some time. Such evidence might be sufficient in such a case, given strong indicia of reliability and an adequate foundation to establish admissibility. But when such evidence is the only source of support for the central allegations of the charge, especially when the statements barely, if at all, meet the minimal requirements of admissibility, we do not believe that a substantial factual basis as to each element of the crime providing support for a conclusion of guilt beyond reasonable doubt has been offered by the Government. *See Phillips v. Neil,* 452 F.2d 337 (6th Cir. 1971), in which this Court concluded that when the State's only rebuttal to a prima facie insanity defense was unattributed medical reports concluding that the patient was competent, the evidence was insufficient to support the conviction, even though the reports met the requirements of a well-established hearsay exception.

■ *California v. Green,* 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970), established that the use of a prior inconsistent statement as substantive evidence does not necessarily violate the Confrontation Clause, so long as the witness who had made the statement is present and available for questioning at trial. For the purposes of this opinion, we assume that the same is true for the past recollection recorded exception to the hearsay rule, though somewhat different considerations come into play. The opinion in *California v. Green* ended with a strong hint that such statements, though constitutionally admissible, nevertheless may not be sufficient, by themselves, to sustain a conviction.[4] We

---

**4.** The Supreme Court remanded the case to the California Supreme Court, specifically urging further consideration of the sufficiency of the evidence. The Court commented: "The issue is not insubstantial. Conviction here rests almost entirely on the evidence in Porter's two prior statements which were themselves inconsistent in some respects." Like the prosecution witness Jones in this case, the witness in *Green*

professed not to remember the crucial events, and was impeached through the use of prior testimony, which was itself somewhat inconsistent with a still earlier statement to the police. We recognize, of course, that in this case Jones is not a young boy accused of involvement in a narcotics transaction, but the similarity in the quality of the statements offered against the defendants is striking.

conclude, under the circumstances of this case, that they are not. Assuming that such statements may be admissible in a criminal case, we believe that they may supply valuable evidence for the prosecution. They may be used to corroborate evidence which otherwise would be inconclusive, may fill in gaps in the Government's reconstruction of events, or may provide valuable detail which would otherwise have been lost through lapse of memory. But the Government having offered such statements as the sole evidence of a central element of the crime charged, we hold that the Government has failed to sustain its burden of proving guilt beyond a reasonable doubt.[5]

Since we conclude that insufficient evidence was introduced at trial to sustain these convictions, we reverse and remand for entry of a judgment of acquittal.

**5.** In addition to the other problems with this case, it appears reversal would be mandated by our recent decision in *United States v. Reeves*, 594 F.2d 536 (6th Cir. 1979). That case condemned an instruction concerning proof of intent which implies that the burden is on the defendant to prove lack of intent. Though the instruction was held to be error in *Reeves*, it did not require reversal because intent was not an issue; it was a bank robbery case, and the only issue was whether or not the defendant was the robber. The exact instruction condemned in *Reeves* was also given in this case, and criminal intent was a critical and bitterly contested issue. Given the general weakness of the proof of intent, consisting primarily of ambiguous statements made months after the transactions, it would be impossible to conclude that the instruction was harmless beyond a reasonable doubt. We do not rest our reversal on this ground, however, since such a decision would leave open the possibility of retrial.