574 A.2d 525

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v. ROBERT MANCINE, DEFENDANT–APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued January 17, 1990—Decided May 10, 1990.

168

Before Judges MICHELS, DEIGHAN and BROCHIN.

*Carl D. Poplar* argued the cause for appellant (*Poplar & Florio*, attorneys; *Carl D. Poplar* on the brief).

*Jessica S. Oppenheim*, Deputy Attorney General, argued the cause for respondent (*Robert J. Del Tufo*, Attorney General, attorney; *Jessica S. Oppenheim*, of counsel and on the brief).

The opinion of the court was delivered by

DEIGHAN, J.A.D.

A Camden County Grand Jury returned a seven-count indictment against defendant charging him with murder, in violation of *N.J.S.A.* 2C:11–3a(1) and (2) (Count I); possession of a weapon for an unlawful purpose, in violation of *N.J.S.A.* 2C:39–4a (Count II); unlawful possession of a weapon, in violation of *N.J.S.A.* 2C:39–5b (Count III); possession of a prohibited device, namely a hollow-nosed bullet, in violation of *N.J.S.A.* 2C:39–3f(1) (Count IV); hindering apprehension or prosecution, in violation of *N.J.S.A.* 2C:29–3b(1) (Count V), and tampering with witnesses and informants, in violation of *N.J.S.A.* 2C:28–5a(2) (Counts VI and VII).

Prior to the commencement of trial, the judge held an *Evid.R.* 8 hearing to determine the admissibility of a taped statement by a witness, Bernadette Hohney. He determined that the tape was admissible pursuant to *Evid.R.* 63(1)(a) and *R.* 22. The judge denied defendant's request for a *Wade*[1] hearing, but the prosecutor's motion to change the date of the incident in the indictment was granted.

Defendant was convicted of aggravated manslaughter, a lesser-included offense of murder, and one count of tampering

[1] *United States v. Wade*, 388 *U.S.* 218, 87 *S.Ct.* 1926, 18 *L.Ed.*2d 1149 (1967).

with a witness. He was acquitted on the remaining counts. The trial judge denied defendant's motion for a new trial but granted the State's application to impose a sentence pursuant to the Graves Act, *N.J.S.A.* 2C:43–6c. Defendant was sentenced to a 20–year term with eight years parole ineligibility on the manslaughter charge and a consecutive term of five years with two years of parole ineligibility on the charge for tampering with witnesses and informants. The judge also imposed a $5,030 fine payable to the Violent Crimes Compensation Board.

The following facts were developed at the Rule 8 Hearing concerning the admission of Hohney's tape recorded statement. From 1976 until 1986, Hohney and Raymond Mullin, the victim, lived together and Mullin fathered two of Hohney's three children. Hohney broke up with Mullin in 1986 and began an affair with defendant. She worked as a waitress at defendant's bar.

The victim was shot shortly before 10:00 p.m. on June 24, 1986 and on the morning of June 25, 1986, Hohney gave her first statement to the Camden police and a second on June 27. In the second statement, Hohney stated that about two weeks before the murder, defendant received a message from the victim that he was going to burn down defendant's bar. When asked by the police to tell them exactly what happened, Hohney stated:

Okay. About two weeks ago, Bob Mancini [*sic*] got a message from Raymond [victim] that he was going to burn his bar up. Bobby Mancini [*sic*] said, that he didn't have to take that ——, that he would get it him [*sic*] taken care of. He said he was going to make a 'phone call, he said he had got a kid that he was going to get to do it. But he got him through another guy, and the guy had told him, that sometime the kid don't do what he's supposed to do. He always goes a little bit further and he kills the victim. A couple of days after that, a couple of guys came in the bar. I couldn't see their faces because they were in the back room with [defendant]. When I went through with the ice bucket to go get ice, they turned their backs to me. Okay, [defendant] was back there talking with them and when I came back through to go back into the bar they turned their backs again. I never got a chance to look at their face. But he did say, on the way to the Motel, he saw a ambulance he says [victim] just got shot. I didn't pay it any attention because I wasn't thinking about anything like that. When we got to the Motel he called to the bar, Junior had

told him that [victim] was shot asked him if he had anything to do with it, he says maybe the kid did it. Okay, he didn't directly say that he done it himself, he said the kid did it. Okay, he says that Raymond was dying and I said, what and I sat on the side of the bed and I started to cry, got up and he says we got to go to the Police Station but when we get there, I want you to tell them that you don't know anything. Anything at all, and I said well I don't really know anything. Everything that you've ever heard don't speak on it. Okay, so then when we got back to when we got to the Police Station, when I left the next morning, he says I'm counting on you. You're the only person that I have. Don't say anything, anything that you know. I said, well I don't know too much, he says, well what you do know he says about the kid and about me making a 'phone call don't tell nobody.

Later, in the statement, Hohney indicated that defendant told her "the kid" was supposed to walk up to the victim and cut him in the chest or shoot him in the leg. She recounted that defendant stated that he did not want the victim killed; but if it happened there was nothing that defendant could do about it.

Hohney testified at the hearing that the statement was given under coercive circumstances because on June 27, 1986, a Division of Youth and Family Service (DYFS) representative came to her home and told her that she was under investigation. That day she got a call from Detective Alesandrini telling her to come down to the station and to bring her children. When Hohney got to the station on the 27th, the police told her what to say and she repeated it back to them. When she had the story straight, she repeated it and they turned on the recorder and taped the statement. The police threatened her that if she did not give them the statement they wanted, they would take her children away and put her in jail. She never signed or read a transcript of this statement, did not see it printed and did not listen to the tape. Hohney maintained that everything in the statement from June 27 was a lie.

At the hearing, Detective Alesandrini admitted that he called Hohney on the 27th and told her that he wanted to talk with her and the children. He asked that the children accompany her because he wanted to find out if they had heard any conversations between defendant and their mother. At that time, the children were 7, 5 and 3 years old.

There was an interview before the tape but Alesandrini denied that the police told Hohney what to say. No threats were made against her and the tone of the conversation was not hostile. Hohney had given the police permission to talk with the children, and they confirmed that defendant was at the house on the 24th.

On June 13, 1988, Alesandrini served Hohney with a subpoena to appear at trial. At that time, he asked her if she had any new information and said she should contact them if she remembered anything. He also asked her if she felt that they had treated her fairly at the interview on June 27, 1986. When questioned as to why he felt compelled to ask her that question, Alesandrini responded that he meant to calm her and wanted more information from her.

In his decision, Judge Steinberg considered Hohney's relationship with defendant and her interest, bias, or prejudice in favor of him. After listening to the tape, he noted that it flowed and did not sound as if it was from one who was coerced or in distress. Instead, he found that Hohney probably thought that she would be in trouble since she knew of the murder, so she went to the police. He concluded that the statement was made under circumstances establishing its reliability and held it would be admissible at trial.

At trial, Theresa Lopez, the victim's sister, claimed that she witnessed defendant approach and shoot her brother. On the night of the shooting, Lopez was walking her dog in the area of Second and Larch Streets in Camden. She saw her brother walking ahead of her and as she watched, she saw a man "trot" up behind him and place a hand on his shoulder. She heard gunfire and saw her brother stumble after which the man turned and ran.

Another witness, Ronni Simmons, stated that as he was walking down the street, he saw two men. The second man ran up behind the first, grabbed him and shot him. Although the lighting was not good, Simmons described the gunman as

having a lot of hair and being somewhat chubby. He was a little taller than the victim and looked either Spanish or white. Simmons did not identify him in a photographic array.

Frederick Mullin, the victim's brother, testified that approximately a month before the victim was killed, defendant told him that "if anything happened to him or his liquor store, he'd pay up to $10,000 to have my brother killed." Mullin and Mancine knew each other from the neighborhood and Mullin had done electrical work for defendant in the past. The victim had been upset because defendant was going out with his former girlfriend.

Francis Marino, a friend of the victim, testified that when he was at defendant's liquor store defendant stated that he would be willing to do anything to get the victim out of the way. About a month and a half before the murder, Marino was told by defendant that "when you fly with the crows, you got shot down yourself." On another occasion approximately a month before the murder, defendant told Marino with regard to the victim that "he wanted to —— him up the ass." According to Marino, the victim never said anything by way of threat to Mancine although Mancine stated that he would be willing to spend his last penny to get rid of the victim. In a statement given by Marino to police, Marino represented that the victim was "haunted by jealousy" because Mancine was dating his former girlfriend.

A third friend of the victim, Dennis Dozier, initially testified that defendant told the victim that if he did not stay away from him, he would "kick his ass, blow him away, —— him up, that kind of thing." On another occasion, defendant said the same type of thing and said if the victim stayed away from him there wouldn't be any trouble. On cross-examination, the defense brought out that defendant had signed a criminal complaint against the victim and that the victim had been indicted for stabbing defendant. On cross-examination, Dozier admitted

that he did not hear defendant say that he would blow the victim away.

Another friend of the victim, Patrick Kelly, testified that on five or six occasions defendant and the victim exchanged remarks. Evidently, defendant taunted the victim that he "had his old lady." On one occasion, Kelly overheard defendant say that "if anything happens to his bar or him, he said he would pay somebody some money to take care of Raymond." According to Kelly, the victim never threatened Mancine as far as he knew.

Bernadette Hohney testified that at one point defendant and the victim had an altercation because of her. At that time she was still living with the victim but they had had a fight. She went to defendant's bar to work as a waitress and while in the backroom changing, the victim entered the bar carrying a knife and tried to stab her. From that point on, the two men "never patched things up."

Early in the morning of June 25, 1986, after the shooting, Hohney and defendant went to the police station. Hohney stated that the statement that she gave to police on the morning of the 25th was true and accurate. She testified that about eight or nine months prior to the victim's death, "some guy" came in the liquor store and told her that someone had been talking about shooting the victim. She asked defendant if he knew anything about it, but he said "no". However, when confronted with the content of her statement of June 25, 1986, Hohney did not remember being asked certain questions including one to which she responded that a few days prior to the shooting defendant told her that he heard that Mullin would be shot. Hohney stated that it was at least a month before the shooting and not a couple of days as reflected in the statement. Hohney later testified that on the morning of June 25, 1986, the officers were using a harsh tone with her.

As to the June 27 statement, Hohney testified that she did not answer honestly the questions asked of her. She said the

things that she said only because of the threats that had been made against her, *i.e.*, that she would lose her children. The statement of June 27 was played to the jury. The transcript of the tape was also given to the jury as a listening aid. On cross-examination, Hohney testified that she and defendant were at a motel together on the night of the shooting.

Defendant testified on his own behalf. Initially, he stated that he and Hohney were together at the Bo–Bet Motel on the night of the murder. He then recounted the story that at one point the victim followed Hohney into the bar and tried to stab her. At that point, defendant fought with the victim. As a result, the victim cut defendant's arm. Based on that incident, defendant filed charges against the victim. Defendant admitted he had stated that if the victim burned down the bar or hurt him in any way, he would spend every dime to get him. However, he explained that he did not mean to have him killed, only to catch him and make him pay. Defendant denied that he ever threatened to kill or have someone "take care of" the victim. Approximately a week or two before the shooting, defendant heard someone in the bar say that he was going to shoot the victim. According to defendant, the victim had "ripped" someone off in a drug deal.

On this appeal, defendant raises the following issues:

I   It was improper to admit as substantive evidence under *R.* 63(1)(a)(i) the June 27, 1986 statement of Bernadette Hohney.

II  It was reversible error for the defendant to be convicted of tampering with the witnesses and informants when the sole evidence to support this conviction was the recanted prior inconsistent statement of Bernadette Hohney.

III It was reversible error for the trial court to instruct the jury on aggravated manslaughter based upon a factual theory not·contained in the indictment or presented to the Grand Jury.

IV  It was reversible error for the trial court to charge the jury on aggravated manslaughter as a lesser included offense of murder.

V   The court below committed error by admitting into evidence Raymond Mullin's blood stained clothing and photographs of Raymond Mullin at the morgue where their probative value was substantially outweighed by undue prejudice to the defendant.

VI The legal errors in this trial in their aggregate prejudiced the defendant's rights to such an extent as to require a reversal.

VII The sentencing of the defendant was illegal in that the court erroneously applied the Graves Act and improperly balanced the aggravating factors so as to sentence the defendant to maximum consecutive terms with parole disqualifiers.

## I

■ Defendant maintains that the trial judge erred by admitting the prior recorded inconsistent statement of Bernadette Hohney given on June 27, 1986, as substantive evidence, since the statement conflicted with the State's theory of the case. Because of the conflict, defendant asserts the State could not have held a good-faith belief in the reliability of the statement which must be shown before such a statement may be admitted.

Under *Evid.R.* 63(1):

A statement is admissible if previously made by a person who is a witness at a hearing, provided it would have been admissible if made by him while testifying and the statement:

(a) Is inconsistent with his testimony at the hearing and is offered in compliance with the requirements of Rule 22(a) and (b); however, when the statement is offered by the party calling the witness it shall be admissible only if, in addition to the foregoing requirements, it (i) is contained in a sound recording or in a writing made or signed by the witness in circumstances establishing its reliability....

Since Hohney was a prosecution witness, the State had to show circumstances that would establish the reliability of the taped statement it sought to introduce. *See State v. Gross*, 216 *N.J.Super.* 98, 107–110, 523 *A.*2d 215 (App.Div.), certif. den., 108 *N.J.* 194, 528 *A.*2d 19 (1987).

■ Defendant points to the contended coercive situation under which the statement was obtained, *i.e.*, Hohney's presence at the police station separated from her children and allegedly threatened with the loss of custody. He also asserts that Alesandrini's question to Hohney regarding whether Alesandrini treated her fairly earlier when she was served with the subpoena to appear in court indicated that the police had indeed coerced the statement from her. Defendant criticizes the

judge's finding of reliability in that the judge merely "inton[ed] the magic word about the 'ring of truth in the statement' and the credibility of the testimony of Det. Alessandrini [*sic*] ... was insufficient legal criteria to base a finding of reliability." He also claims that Hohney's statement exculpates her and implicates defendant. Finally, defendant maintains that the State disavowed the reliability of the statement since the thrust of its case was for a murder conviction in which defendant was the "trigger man."

Defendant's attack on the admission of Hohney's statement is without merit. By applying the criteria set forth in *Gross*, 216 *N.J.Super.* at 109–110, 523 *A.*2d 215, Judge Steinberg's reasoning is sound. When he weighed the credibility of Hohney's testimony at the *Evid.R.* 8 hearing, where Hohney recanted her prior statement to police, he considered the interest that Hohney had in exculpating defendant. He noted that she has had a continuing relationship with defendant from the time she broke up with the victim through the time of the hearing. He also relied heavily upon his impression of the tone of the tape itself. Of particular significance was the statement Hohney attributed to defendant as her reason for giving the statement to the police. In her statement, Hohney stated that defendant

> ... told me he says just tell them you don't know nothing about it he says because if you tell them that you know anything about it then we'll both go to jail. He says especially me for hiring somebody to do it and you because you knew about it.
>
> Q. Fine, is there anything else you wish [....]
>
> A. And I told him that because I knew about it I didn't know much about it. I said if I had known everything he knows that I would have told. He knows if I had known all of it, I would have told, my kids [*sic*] father.

Finally, the judge found that the answer to the last question supported his finding that the statement was made of Hohney's own free will: "This statement that you just gave us is a true statement; is that correct?" Hohney responded, "Yes, with all my heart." The judge found:

> ... [I]t had the ring of truth, the ring of credibility. It flowed and it did not appear to be the product of someone who was under some pressure, conscious or subconscious, to give the right statement, quote, unquote, or she would end

up in trouble. It had the ring of truth to it and there's no way I can make a finding that this statement was anything other than reliable.

Considering the criteria set out in *Gross*, 216 *N.J.Super.* at 109–110, 523 *A.*2d 215, the judge properly concluded that the statement was sufficiently reliable to justify its introduction. Contrary to defendant's assertion, the statement was not exculpatory; in fact, given their relationship, Hohney had an interest in covering for defendant. The statement, while given at the police station, was not the product of an extended interrogation, nor was Hohney a target of the investigation. Moreover, the judge had the benefit of hearing the actual tape and assessing the manner of speaking and tone of voice which the transcribed record does not reveal.

We find no merit to defendant's assertion that the prosecutor exercised bad faith by seeking to admit the statement, because it did not comport with the State's case against defendant. As the State points out, defendant has not shown any evidence of impropriety on the part of the prosecutor.

Nor is there any substance to defendant's argument that the State was required to introduce corroborating evidence in order to establish the admissibility of Hohney's statement. In *Gross*, corroboration is only one of 15 factors that may be considered by a judge. *Gross*, 216 *N.J.Super.* at 110, 523 *A.*2d 215. Lastly, contrary to defendant's contention, it was not necessary for Hohney to testify that she could not remember what she had told the police. This procedure is required only under *Evid.R.* 63(1)(b) concerning past recollection recorded.

## II

Defendant maintains under Point III that the trial judge committed reversible error by instructing the jury on aggravated manslaughter. He contends that the instruction should not have been given since it was based upon a factual theory not contained in the indictment.

Defendant notes that the indictment charges him with caus-
ing the victim's death by shooting him with a handgun but that
there was no charge of aggravated manslaughter based on
defendant hiring someone to hurt the victim, who killed him
instead.  Defendant contends that the judge's charge constitut-
ed plain error because he instructed the jury to consider aggra-
vated manslaughter based upon a completely different factual
scenario than that charged in the indictment.  Even though
defense counsel acquiesced in the charge, defendant asserts
that the error was so prejudicial as to warrant reversal.

Article I, paragraphs 8 and 10 of the New Jersey Constitution
state, in part:

> No person shall be held to answer for a criminal offense, unless on the
> presentment or indictment of a grand jury....
>
> ....
>
> In all criminal prosecutions the accused shall have the right ... to be
> informed of the nature and cause of the accusation.... [N.J. Const. (1947),
> Art. I, pars. 8, 10.]

It is fundamental that an indictment charging a defendant
with the commission of a crime must identify and explain the
criminal offense so that the accused may prepare an adequate
defense. *State v. LeFurge*, 101 *N.J.* 404, 415, 502 *A.*2d 35
(1986); *State v. Talley*, 94 *N.J.* 385, 392, 466 *A.*2d 78 (1983)
(citing *State v. Wein*, 80 *N.J.* 491, 497, 404 *A.*2d 302 (1979)).
However, that principle is not rigid in its application; it is
sufficiently flexible, for instance, to accommodate the common
law doctrine that a defendant may be found guilty of a lesser
offense included in the greater offense charged in the indict-
ment.  *Talley*, 94 *N.J.* at 392, 466 *A.*2d 78; *see State v.
Saulnier*, 63 *N.J.* 199, 306 *A.*2d 67 (1973).

In *LeFurge*, the defendant was indicted for theft.  The trial
Court instructed the jury on conspiracy to commit theft as a
lesser included offense.  The defendant was acquitted of theft,
but convicted on the conspiracy charge.  101 *N.J.* at 409, 502
*A.*2d 35.  The Supreme Court found that defendant had ade-

quate notice to permit him to defend against the conspiracy charge. *Id.* at 415, 502 *A.*2d 35.

> On its face, *N.J.S.A.* 2C:1–8(d)(2) [conviction of included offense permitted] constitutes express notice to defendant that he may be charged with conspiracy as an included offense. In this respect, the statute serves the same purpose as the indictment. Consistent with notions of due process and fairness, the statute provides adequate notice to all defendants that they may be required to defend against the charge of conspiracy to commit the substantive offenses for which they have been indicted.[2] [101 *N.J.* at 415, 502 *A.*2d 35.]

In *LeFurge*, the defendant argued, as does the defendant here, that the statute permitting conviction of included offenses exposed him to conviction for an offense not considered by the grand jury. *Id.* at 418, 502 *A.*2d 35. Nevertheless, "[t]he legislative intent, as expressed in *N.J.S.A.* 2C:1–8(d), is to permit a jury to convict for . . . an included offense even though the grand jury did not allege the existence of [an included offense] in its indictment." *Id.* at 414, 502 *A.*2d 35.

The Court noted that "the indictment must be sufficiently specific 'to preclude the substitution by a trial jury of an offense which the grand jury did not in fact consider or charge'." *Id.* at 415, 502 *A.*2d 35, (quoting *State v. Boratto*, 80 *N.J.* 506, 519, 404 *A.*2d 604 (1979); *State v. Wein*, 80 *N.J.* at 497, 404 *A.*2d 302; *State v. LaFera*, 35 *N.J.* 75, 81, 171 *A.*2d 311 (1961). Notwithstanding this acknowledgment, the Court held:

> Nevertheless, an indictment is merely a pleading device and never an end in itself. *State v. LaFera, supra,* 35 *N.J.* at 81 [171 *A.*2d 311]. Consequently, the principles that an indictment must fairly apprise a defendant of the charges against him and prevent the possibility of multiple prosecution for the same offense are sufficiently flexible to accommodate the common-law doctrine that a defendant may be found guilty of a lesser offense included in the offense charged in the indictment. *State v. Saulnier*, 63 *N.J.* 199, 205 [306 *A.*2d 67] (1973); *State v. Zelicholwski*, 52 *N.J.* 377, 383–84 [245 *A.*2d 351] (1968); *State v. Midgeley*, 15 *N.J.* 574, 579–80 [105 *A.*2d 844] (1954). [*LeFurge*, 101 *N.J.* at 419, 502 *A.*2d 35.]

---

[2]An offense is so included when "[i]t consists of an attempt or conspiracy to commit the offense charged or to commit an offense otherwise included therein." (N.J.S.A. 2C:1–8(d)(2).)

The Court noted that, with some minor variations, the New Jersey Penal Code followed the "included offense" doctrine in § 1.07(4) (Conviction of Included Offense Permitted), 1 *Model Penal Code and Commentaries, (MPC)*, § 1.07, Comment 5, at 129. That section notes that:

Subsection (4) [*N.J.S.A.* 2C:1–8d.] defines the term "included offense" and permits the trier of fact to convict of such an offense even when it is not specifically charged in the accusative pleadings. Convictions for lesser included offenses are authorized in virtually every jurisdiction, either by statute, rule of court, or common law, although jurisdictions differ on how they define "included offense." [*Id.* at 128–129 (citations omitted).]

Defendant here points out that the indictment charges him only with first degree murder by shooting the victim with a handgun, but the State's proofs indicate that a third person shot the victim and that defendant allegedly hired the shooter. Nevertheless, defendant could not have been surprised or prejudiced by the State's proof that he had paid someone to shoot the victim.[3]

---

[3]Before the grand jury, Lieutenant Alesandrini of the prosecutor's office testified:

Q. Did Mr. Mancine, according to Ms. Hohney, also tell her that he had made arrangements for somebody to shoot Mr. Mullen [victim]?

A. Yes, sir.

The June 27, 1986 statement of Hohney indicated defendant's role in paying someone to shoot the victim was even more specific:

Q. Now, when he said he didn't know if the kid did it or not, did this bring back to you when he said he was going to hire someone and the kid would shoot him?

A. Yes it all went right back to all of that.

Q. Now, he told you that the kid he hired sometimes goes a little further than what he's supposed to.

A. Yes.

Q. Did he say, was he supposed to kill him at first or how was he supposed to shoot him?

A. No he said first he told me the Kid was supposed to walk up to Raymond and cut him across the chest, then he said the Kid said that he couldn't get close enough to Raymond to cut him across the chest that he was going to shoot him in the leg. Then he told me he says, the guy told me that the Kid said he don't know if he was going to go further then that or not.

Q. Did Bobby [defendant] say he was worried about that.

The Court in *LeFurge* looked to pretrial disclosure to find that the defendant had not been unfairly surprised by the indictment's failure to charge conspiracy. 101 *N.J.* at 416–417, 502 *A.*2d 35. Here too, the pretrial discovery works against defendant's argument. Hohney's statement was given two days after the shooting and substantially before the trial; undoubtedly defendant received the statements through discovery as well as a list of witnesses among whom were persons that testified that defendant had, on several occasions, threatened to pay someone to take care of the victim. While the indictment did not charge defendant with aggravated manslaughter, he cannot claim prejudice, surprise or inability to prepare the defense. Pretrial discovery sufficiently informed him of the facts in support of the charge in the indictment which is merely a pleading device and never an end in itself. *LeFurge*, 101 *N.J.* at 419, 502 *A.*2d 35.

Defendant's constitutional right to defend himself was not compromised by the failure of the indictment to list aggravated manslaughter as a separate charge.[4] The validity of the convic-

---

A. He said that he didn't want him killed, he said but he didn't he [*sic*] if it happened there was nothing that he could do. He said that if it happened that they did shoot and kill Raymond, there was nothing he Bobby could do.

....

Q. This Kid that he mentioned, supposedly shot Raymond for Bobby where was he from?
A. He didn't say

....

Q. And all he kept mentioning was the Kid.
A. The Kid, he never told me the Kid's name.
Q. Did he say to you that he paid the initial five hundred?
A. He said, I paid the five hundred dollars and when the job's done he gets five hundred more.
Q. Okay. He told you he paid that first five hundred?
A. Yes.

4Usually, the defendant requests a charge on a lesser-included offense. When so requested, this allows the jury to convict of the offense established by the evidence, rather than forcing it to choose between convicting the defendant

tion, however, remains to be resolved based on the instruction on aggravated manslaughter as a lesser-included offense of murder.

### III

In his fourth issue, defendant contends it was reversible error for the trial judge to charge the jury on aggravated manslaughter as a lesser-included offense of murder. He contends that under the facts of this case, aggravated manslaughter cannot come within any of the three categories of lesser-included offenses under *N.J.S.A.* 2C:1–8d which provides:

Conviction of included offenses permitted. A defendant may be convicted of an offense included in an offense charged whether or not the included offense is an indictable offense. An offense is so included when:

(1) It is established by proof of the same or less than all the facts required to establish the commission of the offense charged; or

(2) It consists of an attempt or conspiracy to commit the offense charged or to commit an offense otherwise included therein; or

(3) It differs from the offense charged only in the respect that a less serious injury or risk of injury to the same person, property or public interest or a lesser kind of culpability suffices to establish its commission. [*N.J.S.A.* 2C:1–8d.]

Defendant maintains that subsections (2) and (3) are not applicable to this case; the only theory under which the aggravated manslaughter charge would have been given is under subsection (1). The State apparently agrees, since it maintains that manslaughter was a lesser-included offense under subsection (1).

Defendant asserts that the manslaughter charge did not rest on the "same or less than all the facts required to establish the commission of the offense charged." He claims that it was proper for the trial judge to charge the jury on aggravated

---

of an offense not fully established by the evidence or acquitting, even though the defendant is clearly guilty of some offense. *MPC, supra,* § 1.07, comment 5, at 132. Here, apparently for tactical reasons, trial counsel did not request, nor did he object to, a lesser-included offense charge but determined to opt for a conviction of "all or nothing."

manslaughter only if the same facts could have been used to prove both murder and aggravated manslaughter.[5] We disagree.

The relevant part of *N.J.S.A.* 2C:11–3 defines murder:

a. Except as provided in section 2C:11-4 criminal homicide constitutes murder when:

(1) The actor purposely causes death or serious bodily injury resulting in death; or

(2) The actor knowingly causes death or serious bodily injury resulting in death. [*Ibid.*]

*N.J.S.A.* 2C:11–4(a) defines aggravated manslaughter:

Criminal homicide constitutes aggravated manslaughter when the actor recklessly causes death under circumstances manifesting extreme indifference to human life.[6] [*Ibid.* (footnote added).]

Under the facts of a particular case, the charge of manslaughter as a lesser-included offense may or may not be given. In *State v. Powell*, 84 *N.J.* 305, 419 *A.*2d 406 (1980), defendant was convicted of second-degree murder under Pre–Code Law. The Court held that the evidence was sufficient to warrant a manslaughter charge, *id.* at 320, 419 *A.*2d 406 even though, for strategic reasons, neither the prosecution nor the defense requested a manslaughter charge as a lesser-included offense. *Id.* at 318–320, 419 *A.*2d 406.

In *State v. Choice*, 98 *N.J.* 295, 486 *A.*2d 833 (1985), defendant was convicted of murder. Affirming the conviction, the

---

[5] It would have been a much better practice for the prosecutor to have requested the grand jury to indict the defendant for murder as an accomplice under *N.J.S.A.* 2C:2–6c(1) (a person is an accomplice if, with the purpose of promoting or facilitating the commission of the offense, he solicits such other person to commit it) or as a lesser-included offense under *N.J.S.A.* 2C:1–8d(2) by paying someone to hurt or possibly kill the victim which requires solicitation, an element not required for the completed crime. *LeFurge,* 101 *N.J.* at 420–421, 502 *A.*2d 35, citing 1 *MPC,* § 1.07, comment 5 at 132.

[6] Under the *MPC,* the New Jersey definition of aggravated manslaughter is categorized as murder. *MPC,* § 210.2(b), II *MPC,* at 13; *see also* II *MPC,* § 210.2(b) at 21, 22 and 24. The text notes that many jurisdictions, including New Jersey, have omitted reckless circumstances manifesting extreme indifference to the value of human life as a degree of murder. *Id.* at 26 n. 62.

Court limited *Powell* by holding that the facts did not clearly indicate a charge for provocation/passion manslaughter where no request was made for the charge. *Id.* at 299–300, 486 *A.*2d 833. In *State v. Crisantos (Arriagas)*, 102 *N.J.* 265, 508 *A.*2d 167 (1986), the Court held that it is improper for a court to charge manslaughter, even when requested by the defendant, if there is no rational basis to support a manslaughter conviction. *Id.* at 276, 278, 508 *A.*2d 167, *accord State v. Rose*, 112 *N.J.* 454, 480, 548 *A.*2d 1058 (1988).

*N.J.S.A.* 2C:1–8e provides that "[t]he court shall not charge the jury with respect to an included offense unless there is a rational basis for a verdict convicting the defendant of the included offense." Considering the circumstances and facts involved in this matter, we are satisfied that there was a rational basis for the trial judge to charge aggravated manslaughter as a lesser-included offense of murder and properly charged the jury particularly where, as here, defendant failed to object to the charge at trial.

The American Law Institute (A.L.I.) notes that *MPC,* § 1.07(4) (the counterpart of *N.J.S.A.* 2C:1–8d(3)) pertaining to convictions of included offenses, provides for two conceptually distinct situations, either one or both of which may apply to a given fact pattern. 1 *MPC, supra,* § 1.07(4), Comment 5, at 133. The first situation is one in which the included offense differs from the offense charged only in that a less serious injury or risk of injury is necessary to establish its commission. *Ibid.* The second situation is where the included offense differs from the offense charged only in that it requires a lesser degree of culpability. "For example, negligent homicide requires proof of an element, negligence, not required for proof of intentional homicide." *Ibid.* While conceptually, it cannot be said that upon proof of an intentional killing, all the elements of a negligent killing have been established, it is the A.L.I.'s position that it is proper to convict of an offense of lesser culpability than the offense charged. *Ibid.*

> The most common circumstances are likely to involve offenses that are less serious types of homicides than the one charged; offenses that are the same as the one charged except they require recklessness or negligence while the offense charged requires a purpose to bring about the consequences.... [*Id.* at 134.]

This, in effect, recognizes the jury's right to return a compromised verdict, a view supported by a majority of the A.L.I. *Ibid.*

■ Even where defense counsel believes that a lesser-included charge will impede what is believed to be a substantial chance of an acquittal, and the prosecution believes that a lesser-included charge will impede what it believes to be a substantial chance of conviction of murder, a manslaughter charge should be given to the jury. *Powell,* 84 *N.J.* at 319, 419 *A.*2d 406.

> [W]here the facts on the record would justify a conviction of a certain charge, the people of this State are entitled to have that charge rendered to the jury, and no one's strategy, or assumed (even real) advantage can take precedence over that public interest.... The judge is more than a referee between contestants. He is the law's representative, and it is his duty to see that the will of the law is done. The real function of the adversary system is to help him fulfill that duty. [*Ibid.; accord Talley,* 94 *N.J.* at 394, 466 *A.*2d 78.]

We hold that under the facts in this matter, Judge Steinberg properly charged the jury on aggravated manslaughter, a lesser-included offense of murder.

## IV

■ In Point II, defendant asserts that it was reversible error for him to be convicted of tampering with a witness when the sole evidence for the conviction was the prior inconsistent statement by Hohney. Thus, defendant maintains that his conviction of tampering with a witness must be overturned. Hohney's contradictory statements were the only evidence presented to support the charge of witness tampering. Defendant does not cite, nor does our research uncover, any pertinent New Jersey cases. Defendant relies on several federal and out-of-state cases to support his position.

In *United States v. Orrico*, 599 *F.*2d 113, 115 (6 Cir.1979), based on a statement given by one of the defendant's co-workers and prior grand jury testimony by another co-worker, the defendant was convicted of transporting checks in interstate commerce, knowing them to have been converted and taken by fraud. The defendant was a production manager in charge of the credit life division of a company that was in financial trouble. *Ibid.* The only evidence against defendant was contained in two statements taken one year after the checks were deposited. *Ibid.*

In the first instance, the witness had signed a statement that contained the following sentence, "Mr. Bosse then called Mr. Gennaro Orrico and Mr. Orrico told me over the phone to go ahead and endorse the checks...." *Id.* at 116. Another statement by a co-worker given to the grand jury was that defendant had told him to endorse a check. *Ibid.* One witness was unable to recall specific events at the time of trial since the trial occurred five years after the alleged events. *Id.* at 116. The other witness gave a statement at trial inconsistent with his grand jury statement. *Ibid.* Defendant was convicted solely through the use of these out-of-court statements.

In ruling that defendant should not have been convicted based on the paucity of evidence against him, the court referred to a treatise by Judge Weinstein with regard to Rule 801(d)(1)(A), (admitting prior inconsistent statements as substantive evidence).[7] *Id.* at 118. Judge Weinstein commented that the Federal Rule admitting prior inconsistent statements as substantive evidence will theoretically enable a party to make out a prima facie case even if his only evidence is a previous inconsistent statement. 4 *Weinstein's Evidence*

---

[7]*Evid.R.* 63(1)(a) and (i) provides that under certain conditions, a statement is admissible if previously made by a person who is a witness at a hearing, provided that it would have been admissible if made by him while testifying and the statement is inconsistent with his testimony at the hearing and is in compliance with the requirements of Rule 22(a) and (b).

(1988), par. 801(d)(1)(A)[01] at 801–107. *Orrico,* 599 *F.*2d at 118. The treatise further states:

It is doubtful, however, that in any but the most unusual case, a prior inconsistent statement alone will suffice to support a conviction since it is unlikely that a reasonable juror could be convinced beyond a reasonable doubt by such evidence alone. (4 *Weinstein's Evidence* (1988), 801(d)(1)(A)[01] at 801–107.)

Based on the treatise, the court in *Orrico* held that

when such evidence is the only source of support for the central allegations of the charge, especially when the statements barely, if at all, meet the minimal requirements of admissibility, we do not believe that a substantial factual basis as to each element of the crime providing support for a conclusion of guilt beyond reasonable doubt has been offered by the Government. [599 *F.*2d at 118.]

*Orrico* seems to be the leading case on this issue. Many other states have addressed the problem and appear to agree that one may not be convicted of an offense based only upon a recanted prior inconsistent statement. *Moore v. State,* 473 *So.*2d 686, 687–688 (Fla.App.1984), aff'd, 485 *So.*2d 1279 (Fla. 1986) (evidence was held insufficient for second-degree murder conviction based on the grand jury testimony of the witnesses); *Brower v. State,* 728 *P.*2d 645, 646 (Alaska App.1986) (where complaining witness recanted grand jury testimony as to several incidents of alleged nonconsensual sexual contact with defendant the witness's prior inconsistent testimony alone was held to be sufficient to sustain a conviction. *Id.* at 648); *State v. White Water,* 634 *P.*2d 636, 637 (Mont.1981) (defendant charged with nonconsensual sexual intercourse with his stepdaughter; at trial, based on her recanted statement the Appellate Court held that the trial judge's dismissal of the charge was proper); *see also State v. Lott,* 535 *So.*2d 963, 967–968 (La.App.1988) (where the only implication for burglary was from defendant's brother who told police "what [they] wanted to hear"; recanted testimony insufficient to support conviction); *Chambers v. State,* 755 *S.W.*2d 907, 908, 910–911 (Tex.App.1988), review granted (April 26, 1989) (defendant could not be found guilty of crime of sexual abuse beyond a reasonable doubt when victim testified that no crime occurred and no sworn testimony to the

contrary was offered); *Forrest v. State*, 769 *S.W.*2d 298, 300–301 (Tex.App.1989), reh'g den. (1989); *Machado v. State*, 753 *S.W.*2d 252, 254 (Tex.App.1988), review refused 767 *S.W.*2d 809 (Tex.Crim.App.1989) (recanted testimony insufficient to sustain conviction for arson).[8] "The fact that the prior statement is admitted and given substantive effect does not mean that it will suffice as the sole basis for a conviction. The question of the sufficiency of the evidence remains, 'for the due process clause of the fourteenth amendment may require a minimal standard of evidentiary support to sustain a conviction'." 4 *Weinstein's Evidence* (1988), par. 801(d)(1)(A)[01] at 801–110 (citations omitted).

Here, the State responds that *Orrico,* is inapposite since the witnesses there could not be effectively cross-examined given their failure to remember the events to which they had testified before the grand jury. It notes that Hohney did testify to making the statement, but claimed that it was coerced. Therefore, the jury had all of the information necessary to evaluate the various testimony given by Hohney and to determine which was the most truthful.

We are satisfied from our review of the foregoing authorities that defendant's conviction for witness tampering cannot stand. The conviction on this count was based solely on Hohney's recanted statement that referred to an implied threat by defendant against her. The conviction on this count must be vacated.

## V

Next, we find no merit to defendant's contention that the trial judge erred by admitting the victim's blood-stained clothing and photographs of the victim at the morgue and that legal errors in their aggregate prejudiced his rights. *R.* 2:11–3(e)(2).

---

[8]*See also* 4 *Weinstein's Evidence* (1988), par. 801(d)(1)[01], 801–96 to 2801–110.

Since we have found no trial errors, there can be no cumulative errors prejudicial to defendant. *Cf. State v. Orecchio*, 16 *N.J.* 125, 129, 106 *A.*2d 541 (1954).

■ The photographs are not included in the record before us but the trial judge noted that they were not gruesome. One showed a bullet wound in the victim's back and the other depicted his face with his eyes closed and without bruises. The trial judge's decision to admit evidence pursuant to *Evid.R.* 4 is entitled to deference and may be reversed only upon a finding that the trial judge abused his discretion thus resulting in a manifest denial of justice. *State v. Moore*, 113 *N.J.* 239, 295, 550 *A.*2d 117 (1988). We find no error in the admission of the photographs. *See State v. Thompson*, 59 *N.J.* 396, 419–420, 283 *A.*2d 513 (1971).

■ As to the blood-stained clothing, the trial judge determined that the fact that the clothing had the blood on it would not overwhelm the jury. *State v. Holland*, 59 *N.J.* 451, 457, 283 *A.*2d 897 (1971). Again, the admissibility of this evidence is controlled by *Evid.R.* 4 and we find no abuse of discretion.

VI

Lastly, defendant contends that the judge erroneously applied the Graves Act and improperly balanced the aggravating and mitigating factors in order to sentence him to maximum terms. On the aggravated manslaughter count, he was sentenced to 20 years with an eight-year parole disqualifier and on the witness tampering charge he received a consecutive term of five years with two years parole ineligibility, along with a $5,030 VCCB penalty.

Under the Graves Act a person who has been convicted of aggravated manslaughter and who "used or possessed a firearm" during its commission, "shall be sentenced by the court to an extended term as authorized by *N.J.S.A* 2C:43–7c, notwithstanding that extended terms are ordinarily discretionary with

the court." *N.J.S.A.* 2C:43–6c. Defense counsel argued before the trial judge, as he does here, that because defendant had been acquitted of the possessory offense charge, he could not be sentenced under the Graves Act.

The judge found from Hohney's statement that since defendant knew or had reason to know that the "Kid" he hired would possess a firearm, he was therefore eligible for sentencing pursuant to the act:

> I am satisfied that this defendant hired and I am satisfied by a preponderance of the credible evidence, actually by proof that is clear and convincing if not beyond a reasonable doubt, I am satisfied that this defendant hired the kid and at the time that he hired the kid to commit the crime he knew or at the very least had reason to know, but I am satisfied that he actually knew that the kid would be in possession of a firearm and find the Graves Act to be applicable.

There is substantial credible evidence in the record to support the trial judge's conclusion. *State v. Johnson*, 42 *N.J.* 146, 162, 199 *A.*2d 809 (1964).

▆▆▆▆▆ The significance of the use and possession of a firearm is not limited solely to situations involving actual possession but includes accomplice liability of another's physical possession of a firearm, provided the defendant knew or should have known that a firearm would be used in the commission of a crime. *State v. Weeks*, 107 *N.J.* 396, 400, 526 *A.*2d 1077 (1987); *State v. White*, 98 *N.J.* 122, 126, 484 *A.*2d 691 (1984). The operative fact concerning Graves Act liability for accomplices is whether there is a shared intent or purpose in the commission of the armed offense. *Weeks*, 107 *N.J.* at 403–405, 526 *A.*2d 1077; *White*, 98 *N.J.* at 129–130, 484 *A.*2d 691.

> ... If an accomplice is convicted only of an unarmed offense, but the trial court finds that the defendant nonetheless knew or had reason to know that his cohort would use or be in possession of a firearm in the course of committing or attempting to commit the crime, including the immediate flight therefrom, the accomplice is likewise subject to Graves Act penalties. [*White*, 98 *N.J.* at 126, 484 *A.*2d 691.]

Again, we find there is substantial credible evidence in the record to support the trial judge's conclusion that the defendant knew or had reason to know that his cohort would use or be in possession of a firearm and therefore that the defendant shared intent with the perpetrator.

Nor is there any merit to defendant's contention that the trial judge improperly balanced the aggravating factors pursuant to *N.J.S.A.* 2C:44–1a. and b. He found that there was risk that defendant would commit another offense; that defendant had a prior criminal record consisting of only one conviction but four arrests which were not weighed as convictions (he considered them as part of defendant's overall character); and that defendant committed the offense pursuant to an agreement. *N.J. S.A.* 2C:44–1a.(3), (6) and (7). The only mitigating factor that he found was that imprisonment would entail excessive hardship to dependents. *N.J.S.A.* 2C:44–1b.(11).

We find no error or abuse of discretion by the trial judge in imposing the 20–year term with a 10–year parole ineligibility. We are clearly convinced that the aggravating factors substantially outweighed the mitigating factors. *N.J.S.A.* 2C:43–6b.

## VII

The conviction and sentence on the manslaughter count is affirmed; the conviction for tampering with a witness is vacated.