590 A.2d 1107

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT AND
CROSS–APPELLANT, v. ROBERT J. MANCINE,
DEFENDANT–APPELLANT AND CROSS–RESPONDENT.

Argued February 13, 1991—Decided May 21, 1991.

*Carl D. Poplar* argued the cause for appellant and cross-respondent.

*Jessica S. Oppenheim,* Deputy Attorney General, argued the cause for respondent and cross-appellant (*Robert J. Del Tufo,* Attorney General of New Jersey, attorney).

The opinion of the Court was delivered by

GARIBALDI, J.

Defendant, Robert J. Mancine, was indicted for murder, tampering with a witness, and other related weapons charges arising from the killing of Raymond Mullin, Jr. A jury convicted him of aggravated manslaughter and tampering with a witness, and acquitted him of all other charges. The substantive evidence primarily supporting defendant's convictions was the recanted prior inconsistent statements of Bernadette Hohney.

The principal issue is the effect that the "presence or absence of corroborating evidence" has on the use of Hohney's recanted prior inconsistent statements as substantive evidence to support Mancine's criminal convictions. There are two subsidiary issues. One, may defendant's conviction for aggravated manslaughter, predicated on a hired-gun theory, stand even though his indictment for murder was predicated on the theory that he personally shot Mullin? And, two, can a defendant convicted of aggravated manslaughter properly be sentenced under the Graves Act since the hired gun actually shot the victim?

I

A.

Until several months before his death on June 24, 1986, Raymond Mullin shared a home with Bernadette Hohney. In

the same neighborhood in which this couple lived, Robert Mancine operated a liquor store and bar that had been run by his family for fifty years. Although the area could be described as "tough" or "high-crime," the neighborhood also was somewhat close-knit—most people recognized one another. Mullin and Hohney frequented Mancine's liquor store. Mullin's sister, Theresa Lopez, called Hohney her "best friend" from the time she was six years old and described Mancine as someone she saw every day while growing up. Mancine knew many of his customers and neighbors by sight, if not by name.

In late 1985, Bernadette Hohney obtained employment as a barmaid in Mancine's establishment. She believed that the income from the job would help with the care of her three children. Mr. Mullin rarely, if ever, contributed financial support for their children. He did, however, do some odd jobs around Mancine's bar and often came there to pick up or drop off Ms. Hohney. Mullin's and Hohney's encounters at the bar often brought their private disagreements into public view.

In the spring of 1986, as the relationship between Mullin and Hohney deteriorated, a relationship between Hohney and Mancine grew. Mancine became a confidant of Hohney. When she finally threw Mullin out of the house, Hohney confided in Mancine. When her mother became terminally ill and Bernadette herself neared a nervous breakdown, she turned to Robert Mancine for support. She found talking with him easy. Despite the fact that he had a wife and children, they began to date, and soon became sexually intimate.

On May 2, 1986, the hostile relationship between Mullin and Hohney erupted into violence at the bar. After another argument with Mullin, Hohney arrived at work that day quite upset. Soon after her arrival, Mullin came into the tavern and threatened her with a hooked carpet knife. Mancine, to protect her and his establishment, interceded, first verbally and then physically. The ensuing scuffle led to Mullin stabbing Mancine in the left arm. Mancine, however, quickly disarmed Mullin. He

wrestled Mullin to the ground and held a knife to Mullin's throat until the police arrived. That encounter led to charges being filed against Mullin, mutual restraining orders being issued against Mullin and Hohney, and an escalating exchange of threats between Mullin and Mancine ranging from the graphically direct and profane to the obscure and proverbial.

Shortly before 10:00 p.m. on June 24, 1986, Raymond Mullin began to walk home after spending some time drinking beer on the street corner. Theresa Lopez saw her brother in the distance. She recognized his gait. Suddenly, a man trotted up behind Mullin and shot him in the back at close range. The force of the shot threw Mullin to the ground. He rose and staggered some fifty feet. He fell again, bleeding heavily. He died within three hours. Both Theresa Lopez and Ronnie Simmons, a young man hanging out in the area, witnessed the killing. At the police station that night, Theresa Lopez told police that she believed that defendant, whom she knew, was the killer. She then picked his picture out of a photographic array. Ronnie Simmons gave police a description of the killer that somewhat matched defendant, but he was unable to identify defendant in a photographic array.

## B.

At approximately 1:00 a.m. on June 25, defendant and Hohney arrived at the police station. Each of them gave a statement to Lieutenant Alesandrini of the Camden County Prosecutor's Office, but Bernadette's would prove the more important. Hohney was quite upset. Although she wanted to make a statement, she could get little further along than her bare biography before she had to take a break to compose herself. After resuming, she detailed her activities on the night of the murder. At about 9:30 p.m., she had been sitting at defendant's bar, talking with her sister. Defendant was also there, although for a time he "went up front" to make a phone call and to speak with someone. He was out of Hohney's sight for

five to ten minutes. She left the bar with defendant at about 10:00 p.m. and they went to the Bo–Bet Motel where they had sexual intercourse. While at the motel, defendant, as was his custom, called his bartender for a report on the evening's activities and was told that Mullin had been shot and that the police wished to question him. Mancine hung up, told Bernadette that Raymond Mullin had been shot, and went with her to the police station.

Eventually, Hohney's statement began to focus on Mullin and Mancine. She acknowledged the ill feeling between them. The police did not ask her whether she or Mancine had been involved in any way in Mullin's death. They did, however, ask her if she knew of any threats against Mullin's life. She said that Mancine had informed her a few days before Mullin's death "that some guy had come in and said that he was gonna shoot Raymond." Although explicitly asked, she did not, or would not, provide any additional information. When asked if her statement was "truthful and accurate," her ambiguous reply was "yeah, I guess." Before she left, the police made tentative arrangements to speak with her again and to interview her children.

On Friday, June 27, 1986, two officers transported Hohney, her children, and their babysitter to police headquarters where Hohney was placed in a room separate from the others. Before any interview could commence the interrogator received a call from defendant who told him that Hohney was "not supposed to say anything because she's represented by the same attorney that represents me."

On that date, Hohney gave her second statement, which was taped. In it she set forth the hired-gun theory that Mancine had paid someone "to take care" of Raymond Mullin.

Q. Alright. Tell us in your own words, now exactly what you know about this shooting.

A. Okay. About two weeks ago, Bob Mancini [sic] got a message from Raymond that he was going to burn his bar up. Bobby Mancini [sic] said, that he didn't have to take that shit, that he would get it him taken care of. He said

he was going to make a phone call, he said he had got a kid that he was going to get to do it. But he got him through another guy, and the guy had told him, that sometime the kid don't do what he's supposed to do. He always goes a little bit further and he kills the victim. A couple of days after that, a couple of guys came in the bar. I couldn't see their faces because they were in the back room with Bobby. When I went through with the ice bucket to go get ice, they turned their backs to me. Okay, Bobby was back there talking with them and when I came back through to go back into the bar they turned their backs again. I never got a chance to look at their face. But he did say, on the way to the Motel, he saw a ambulance he says Raymond just got shot. I didn't pay it any attention because I wasn't thinking about anything like that. When we got to the Motel, he called to the bar, Junior had told him that Raymond was shot asked him if he had anything to do with it, he says maybe the kid did it. Okay, he didn't directly say that he done it himself, he said the kid did it.

 \* \* \* \* \* \* \* \*

Q. Okay, now you say approximately two weeks ago from when Raymond was shot when this conversation about making a phone call came up?

A. Un huh.

Q. You have to answer yes or no.

A. Yes.

Q. Alright and he supposedly made a phone call to somebody to hire somebody to kill Raymond.

A. And he had mentioned something about paying five hundred that day and five hundred when the job was done.

 \* \* \* \* \* \* \* \*

Q. Did he say, was he supposed to kill him at first or how was he supposed to shoot him?

A. No he said first he told me the Kid was supposed to walk up to Raymond and cut him across the chest, then he said the kid said that he couldn't get close enough to Raymond to cut him across the chest that he was going to shoot him in the leg. Then he told me he says, the guy told me that the Kid said he don't know if he was going to go further than that or not.

Q. Did Bobby say he was worried about that?

A. He said that he didn't want him killed, he said but he didn't he if it happened there was nothing that he could do. He said that if it happened that they did shoot and kill Raymond, there was nothing he Bobby could do.

[Q]. Now he kept mentioning that this was the Kid, is that how he said it the Kid?

A. The Kid, he never mentioned the name, he always said the Kid. This Kid, that Kid, the Kid. And I always asked him, who, who, because I never, I didn't tell Bobby that I was going to tell the Kid's father about it. Okay, if I actually found out who was going to do this to him that way he could be on his P's and Q's to stay away. Okay, but he would never mention a name, he would never say anything else to me.

Hohney's statement also explained why she had withheld the foregoing information initially:

Okay, he says that Raymond was dying and I said, what and I sat on the side of the bed and I started to cry, got up and he says we got to go to the Police Station but when we get there, I want you to tell them that you don't know anything. Anything at all, and I said well I don't really know anything. Everything that you've ever heard don't speak on it. Okay, so then when we got back to when we got to the Police Station, when I left the next morning, he says I'm counting on you. You're the only person that I have. Don't say anything, anything that you know. I said, well I don't know too much, he says well what you do know he says about the kid and about me making a phone call don't tell nobody.

When the detectives heard that Mancine had influenced her to withhold information, they pressed the interrogation.

Q. Now, after you left the Motel and you were on your way to the Police Department, is this when he started to tell you don't tell the Police anything?

A. Don't say anything, just keep your mouth shut and tell them you don't know nothing about it.

Q. Okay.

A. He told me he says just tell them you don't know nothing about it he says because if you tell them that you know anything about it then we'll both go to jail. He says especially me for hiring somebody to do it and you because you knew about it.

Q. Fine, is there anything else you wish.

A. And I told him that because I knew about it I didn't know much about it. I said if I had known everything he knows that I would have told. He knows if I had known all of it, I would have told, my kids father.

She also explained why she was then coming forward. Despite being "scared" of being implicated herself (her fear was based in part on Mancine's predictions), she came forward to preserve her relationship with her children.

Okay and I told Bobby I said, Bobby I can't live my life like this. I have three babies and I'm not going to lose my babies. If push came to shove then I would tell whatever I knew.

In contrast to the ambivalent "Yeah, I guess" conclusion to her previous statement, she supported the truth of this statement with the words "with all my heart." She never signed the transcript of the statement.

## C.

The statements of Theresa Lopez and Bernadette Hohney led to the arrest of Robert Mancine for murder. Based on Ms. Lopez's eyewitness testimony, Mancine was indicted for murder on the theory that he shot Raymond Mullin. Based on Ms. Hohney's statement regarding the influence he had attempted to assert over her as well as his attempts to interrupt the detective's interview of her, he was indicted on two counts of witness tampering. There was no aggravated-manslaughter indictment and only an oblique reference at the grand jury to the idea that Mancine had hired someone to kill Raymond Mullin rather than fire the gun himself. He was also indicted on various weapons charges.

On the first day of trial the court conducted a Rule 8 hearing to determine whether Hohney's prior inconsistent statement of June 27 was admissible as substantive evidence of Mancine's crime. At both the Rule 8 hearing and at the trial itself, Bernadette Hohney recanted her June 27 statement. At the Rule 8 hearing she testified that she had lied in implicating Mancine in Mullin's death. She claimed two reasons for lying.

First, Hohney asserted that the detectives who interviewed her had threatened her, intimidated her, and had given her a story to parrot back to them. She claimed that on June 26, 1986 (one day prior to giving the recanted statement), a representative from the Division of Youth and Family Services came to her home and informed her she was under investigation, thereby threatening her. She was frightened that her children would be taken from her. Accordingly, she gave the statement only so she could leave and take her children, who were in the Prosecutor's Office, home.

Second, Hohney claimed she did it to spite Robert Mancine who, rather than following her earlier suggestion to "slow down" their relationship, had totally severed it. Armed with those two reasons, Hohney claimed that the whole story about "the Kid" and about Mancine's admonition not to speak to the

authorities had been fabricated—in her own words, she had "made all of it up." Because she had rekindled her relationship with Mancine, she abandoned the statement that she claimed illustrated her anger rather than its own truth.

Detective Alesandrini was the only other witness to testify at the Rule 8 hearing. He said that no coercion or threats had been used against Ms. Hohney to obtain the June 27th statement. He testified that he did ask Hohney to bring along her children, ages 7, 5 and 3, because he had information that Mancine was at their house on the night of the shooting and he wanted to inquire if the children had heard any conversation between defendant and Hohney about Mullin.

Alesandrini also testified that on June 13, 1988, he had spoken with Hohney while serving her a subpoena to appear at trial. At that time he asked Hohney if she had been treated fairly by the interviewing detectives. Alesandrini testified that she answered she had been treated fairly. Hohney testified that she did not remember being asked the question.

The prosecutor attacked Hohney's credibility, noting the time lag between her reconciliation and her recantation. She had resumed her relationship with Mancine about one week after the killing but had still not recanted as of June 13, 1988—almost two full years later. The prosecutor argued that if her June 27th statements were untrue and made in anger, the salve of the resumed relationship should have caused immediate recantation. It had not.

The trial court ruled, based on its observation of the witnesses (Hohney and Alesandrini) and its analysis of the tape of the statement, that Hohney's prior inconsistent statement was admissible as substantive evidence under *New Jersey Rule of Evidence* 63(1)(a).

Hohney testified at trial, and again recanted her June 27th statement. The jury listened to the tape of her June 27th statement with a transcript of the statement as a listening aid. Alesandrini gave testimony concerning the investigation, includ-

ing the circumstances under which he took the June 27th statement. Lopez and Simmons, eyewitnesses to the homicide, gave testimony on what they saw the night of the murder. Four other witnesses, friends or relatives of the victim, testified that they had heard defendant threaten to harm the victim or to hire someone to harm him on numerous occasions. Frederick Mullin, the victim's brother, testified that Mancine had told him that he would pay up to $10,000 to end his problems with Raymond Mullin, while another witness, Francis Marino, quoted Mancine as being willing to "spend his last penny." Marino went on to state that Mancine's threats could be lewd (we will refrain from repeating them here) or lyrical ("when you fly with the crows, you get shot down yourself"). Patrick Kelly remembered Mancine promising to "pay somebody some money to take care of Raymond." Dennis Dozier, a friend of the victim who frequented Mancine's liquor store, described himself as an envoy between these two men. After delivering one message to Mancine in early June of 1986, Dozier listened as Mancine responded that he would "kick [Mullin's] ass, blow him away [and] —— him up."

Defendant, testifying on his own behalf, denied having had any involvement with the victim's death. He claimed that he had been with Hohney at the motel on the night of the homicide. He testified that Mullin's threats to take his revenge against Mancine, the family business, and perhaps his family had "scared" him. He also acknowledged saying "I would spend whatever money I have to get [Raymond Mullin] for burning the bar down or whatever I had to do."

Because the taped statement provided evidence that Mancine paid someone else to pull the trigger, the court, defense counsel, and the prosecutor agreed that the proposed jury charges should reflect that alternative ground for decision. Accordingly, the court, relying on *State v. Powell*, 84 *N.J.* 305, 419 *A.*2d 406 (1980), and its successors, charged the jury on a "hired killer" murder theory and "hired ruffian" aggravated-manslaughter theory in addition to the indicted murder and weap-

ons charges that rested on the theory that Mancine was the actual shooter. No one objected to the manslaughter charges.

Defense counsel and the prosecutor each dealt with the alternative theories in summation, although the prosecutor and defense counsel both argued against accepting any "hired gun" version of the crime. Despite unanimity of the advocates against such a version, the jury followed the court's instructions (to, if warranted, "reject the inferences as suggested by counsel and drew your own inferences") and accepted a "hired gun" version of the crime. In doing so it acquitted Mancine of murder and of all weapons charges. The jury found him guilty of aggravated manslaughter for hiring someone whom he recklessly sent to hurt Raymond Mullin and who instead killed the victim. It also convicted defendant of one count of witness tampering for influencing Bernadette Hohney to refrain from giving a full statement on June 25, 1986.

The trial court denied defendant's motion for a judgment of acquittal or in the alternative for a new trial. After hearing argument on whether defendant should be sentenced under the Graves Act, *N.J.S.A.* 2C:43–6c, the trial court found that the Graves Act was applicable. Defendant received a twenty-year term with eight-years parole ineligibility for the aggravated-manslaughter conviction and a consecutive five-year term with two-years parole ineligibility for the conviction for tampering with a witness. He also was fined $5,030.

Defendant appealed his convictions to the Appellate Division, which affirmed the aggravated manslaughter conviction but reversed the conviction for witness tampering. 241 *N.J.Super.* 166, 574 *A.*2d 525 (1990). Defendant petitioned for certification, urging reversal of his aggravated-manslaughter conviction; challenging the admission of Hohney's June 27th statement as substantive evidence; and arguing that even if the statement had properly been admitted, it is "improper to convict a defendant of aggravated manslaughter on the basis of an uncorroborated recanted statement." He further asserts that aggrava-

ted manslaughter could not be a lesser-included offense of murder "if it is predicated upon different facts and a different factual theory of prosecution which was not considered by the police, the prosecution, or the grand jury." Finally, defendant challenges his sentencing under the Graves Act.

The State also petitioned for certification, urging that the Appellate Division wrongly reversed the conviction for tampering with a witness. The State argues that prior inconsistent statements are not *per se* insufficient to support a conviction, but should be "subject to the same standard of sufficiency required for any evidence admitted substantively."

We granted certification. 122 *N.J.* 337, 585 *A.*2d 352 (1990).

## II

### A.

At common law, a witness's prior inconsistent statement could not be admitted as substantive evidence by the party calling the witness. This "orthodox" approach "was based on a threefold rationale of lack of trustworthiness: (1) the statement was not made under oath, (2) the trier of fact did not observe the declarant's demeanor at the time the statement was made, and (3) the declarant was not subject to contemporaneous cross-examination before the trier of fact by the party against whom the statement is being offered." Graham, "Employing Inconsistent Statements for Impeachment and as Substantive Evidence: A Critical Review and Proposed Amendments of Federal Rules of Evidence 801(d)(1)(A), 613 and 607," 75 *Mich. L.Rev.* 1565, 1568 (1977) (*quoted in State v. A. Gross*, 121 *N.J.* 1, 8, 577 *A.*2d 806 (1990)).

Increasingly, however, the assumptions underlying the orthodox rule have been challenged. Specifically, scholars have focused on cross-examination of the witness as the principal way of guarding against the fears expressed in the orthodox rule.

[T]he witness who has told one story aforetime and another today has opened the gates to all the vistas of truth which the common law practice of cross-examination and re-examination was invented to explore. The reasons for the change of fact, whether forgetfulness, carelessness, pity, terror, or greed, may be explored by the two questioners in the presence of the trier of fact, under oath, casting light on which is the true story and which the false. It is hard to escape the view that evidence of a prior inconsistent statement, when declarant is on the stand to explain it if he can, has in high degree the safeguards of examined testimony.

[McCormick, *Evidence*, § 251, at 601–06 (E. Cleary 2d Ed.1972).]

*See also* 3A Wigmore, *Wigmore on Evidence*, § 1018 (1970) ("We simply set the two [statements] against each other, perceive that both cannot be correct, and immediately conclude that he had erred in one or the other-but without determining which one"). Where the witness is available to testify, the whole purpose of the hearsay rule is satisfied. Scholars have also recognized that prior statements are made closer to the event and hence usually record fresher and stronger memories. Hence, they are more reliable.

Although some states still adhere to the traditional approach, the majority, including New Jersey, has moved away from it. Annotation, "Use of Admissibility of Prior Inconsistent Statements of Witness as Substantive Evidence of Facts to Which They Relate in Criminal Case—Modern State Cases," 30 *A.L. R.*4th 414 (1984); *see State v. A. Gross, supra,* 121 *N.J.* at 8–9, 577 *A.*2d 806.

In 1980 subsection (a) was added to *Evidence Rule* 63(1) to allow the use of prior inconsistent statements as substantive evidence:

A statement is admissible if previously made by a person who is a witness at a hearing, provided it would have been admissible if made by him while testifying and the statement:

(a) Is inconsistent with his testimony at the hearing and is offered in compliance with Rule 22(a) and (b); however, when the statement is offered by the party calling the witness it shall be admissible only if, in addition to the foregoing requirements, it (i) is contained in a sound recording or in a writing made or signed by the witness in circumstances establishing its reliability or (ii) was given under oath subject to the penalty of perjury at a trial or other judicial, quasi-judicial, legislative, administrative or grand jury proceeding, or in deposition.

██ Despite that addition to the Rule we still "acknowledge particular concerns about the reliability of such statements." *State v. A. Gross, supra,* 121 *N.J.* at 9, 577 *A.2d* 806. Accordingly, the amended Rule imposes limits on the use of a prior inconsistent statement. Such statements must pass the double hurdle of a Rule 8 hearing on admissibility and in-court cross-examination prior to a finding on sufficiency. *See* New Jersey Supreme Court Committee on Evidence, *Report on the Rules of Evidence,* Comment on *Evidence Rule* 63(1)(a), at 130, 135 (1963) (noting that "admissibility of evidence and the sufficiency of evidence are two separate problems, and different tests should be used for submission for the admission of evidence and for the determination as to the sufficiency when all the evidence is in"). A "thumbs down" on either test could preclude a conviction. *State v. A. Gross, supra,* 121 *N.J.* at 15, 577 *A.2d* 806.

In addition to the limitations of *Evidence Rule* 63(1)(a), we have determined other factors that a court should use in evaluating and examining a statement's reliability. Those factors are

(1) the declarant's connection to and interest in the matter reported in the out-of-court statement, (2) the person or persons to whom the statement was given, (3) the place and occasion of giving the statement, (4) whether the declarant was then in custody or otherwise a target of the investigation, (5) the physical and mental condition of the declarant at the time, (6) the presence or absence of other persons, (7) whether the declarant incriminated himself or sought to exculpate himself by his statement, (8) the extent to which the writing is in the declarant's hand, (9) the presence or absence, and the nature of, any interrogation, (10) whether the offered sound recording or writing contains the entirety, or only a portion [or a] summary, of the communication, (11) the presence or absence of any motive to fabricate, (12) the presence or absence of any express or implicit pressures, inducement or coercion for making the statement, (13) whether the anticipated use of the statement was apparent or made known to the declarant, (14) the inherent believability of the statement, and (15) the presence or absence of corroborating evidence.

[*State v. A. Gross, supra,* 121 *N.J.* at 10, 577 *A.2d* 806 (quoting *State v. A. Gross,* 216 *N.J.Super.* 92, 109–10, 523 *A.2d* 212 (App.Div.1987)).]

Neither side argues that Hohney's statement did not meet the requirements of *Evidence Rule* 63(1)(a). Their disagree-

ment arises out of the extent, if any, that independent corroboration is necessary for a prior inconsistent statement to be used as the sole support for a defendant's criminal conviction. The State asserts that once a prior inconsistent statement, even if it constitutes the sole supporting evidence of a crime, meets the standards of admissibility, it may be sufficient on its own to support a defendant's criminal conviction. Defendant, on the other hand, asserts that unless there is independent corroboration of the evidence of the crime, an admissible prior inconsistent statement, if the sole evidence of the crime, is insufficient to support a criminal conviction. Both sides cite case law to support their position.

Defendant relies on the states that have followed the Sixth Circuit's approach in *United States v. Orrico,* 599 *F.*2d 113 (1979), and adopted a *per se* rule against the use of a prior inconsistent statement as the sole substantive evidence supporting a conviction. *See State v. Moore,* 485 *So.*2d 1279 (Fla.1986) (finding that the risk of convicting an innocent person is too great where a prior inconsistent statement was sole substantive evidence); *Commonwealth v. Daye,* 393 *Mass.* 55, 469 *N.E.*2d 483 (1984) (stating in dicta that convictions based exclusively on inconsistent, extrajudicial statements would not stand); *State v. White Water,* — *Mont.* —, 634 *P.*2d 636 (1981) (upholding dismissal where prior inconsistent statement would have been sole evidence); *see also Brower v. State,* 728 *P.*2d 645 (Alaska App.1986) (citing *Moore* and *Orrico* ). *But see United States v. Woods,* 613 *F.*2d 629, 637 (6th Cir.) (sustaining convictions where grand jury testimony was "apparently the only direct evidence linking Underwood to the robbery"), *cert. denied,* 446 *U.S.* 920, 100 *S.Ct.* 1856, 64 *L.Ed.*2d 275 and *cert. den. sub. nom. Underwood v. United States,* 446 *U.S.* 920, 100 *S.Ct.* 1856, 64 *L.Ed.*2d 275 (1980).

The State, however, relies on the other states that have taken the view that a prior inconsistent statement admitted as substantive evidence can sustain a conviction because a "jury has the right to rely on such evidence as much as on any other

evidence in the case." *Acosta v. State,* 417 *A.*2d 373, 377 (Del.1980). Other cases have made similar holdings. *E.g., Montoya v. People,* 740 *P.*2d 992 (Colo.1987) (affirming sexual-assault conviction despite lack of any substantive evidence other than thirteen-year-old's prior inconsistent statement); *Watkins v. State,* 446 *N.E.*2d 949 (Ind.1983) (affirming conviction based on prior inconsistent statement where "no other in-court testimony or circumstantial evidence placed" defendant at the scene); *State v. Maestas,* 92 *N.M.* 135, 584 *P.*2d 182 (1978) (affirming aggravated-battery conviction on the basis of prior inconsistent statement); *State v. Igoe,* 206 *N.W.*2d 291 (N.D.1973) (sustaining conviction for drug offense based solely on grand jury testimony); *Chambers v. State,* 805 *S.W.*2d 459 (Tex.Cr.App.1991) (overruling reversal of conviction based on prior inconsistent statement, noting that evidence tended to corroborate that statement).

Both sides describe a parade of horrors that will haunt our law if their position is not adopted. We do not adopt either position in its entirety. Instead, we find that the concerns emerging from the use and testing of prior inconsistent statements shadow concerns in our treatment of recanted or disavowed confessions. Because of the damning nature of such evidence and the specter of illicit coercion, we seek to assure ourselves of the voluntary, reliable nature of such a statement in any given case.

In the confession context, we have stated that a trial court "must determine whether there is any legal evidence, apart from the confession of facts and circumstances, from which the jury might determine that the confession is trustworthy." *State v. Lucas,* 30 *N.J.* 37, 62, 152 *A.*2d 50 (1959). As long as the confession is "corroborated by other evidence tending to strengthen it, ... the criminal agency (as well as defendant's connection with the crime) may be proven by the confession itself." *Id.* at 54, 152 *A.*2d 50; *cf. State v. Bryant,* 217 *N.J.Super.* 72, 524 *A.*2d 1291 (App.Div.), *certif. denied* 108 *N.J.* 202, 528 *A.*2d 24, *cert. denied,* 484 *U.S.* 978, 108 *S.Ct.* 490, 98

*L.Ed.*2d 488 (1987) (applying a similar rationale where a prior inconsistent statement, rather than a confession, was sole evidence linking defendant to the crime). We recently reaffirmed our adherence to this principle in *State v. DiFrisco,* when we said:

> Under the New Jersey Rule, the State need not produce independent proof that Franciotti paid DiFrisco but must *produce only "independent proof of facts and circumstances which strengthen or bolster the confession and tend to generate a belief in its trustworthiness." Lucas, supra,* 30 *N.J.* at 56, 152 *A.*2d 50. Or, in other words, "[a]ll elements of the offense must be established by independent evidence or corroborated admissions, *but one available mode of corroboration is for independent evidence to bolster the confession itself and thereby prove the offense 'through' the statements of the accused." Smith v. United States,* 348 *U.S.* 147, 156, 75 *S.Ct.* 194, 199, 99 *L.Ed.* 192, 200–01 (1954). [118 *N.J.* 253, 273, 571 *A.*2d 914 (1990) (emphasis added).]

■ A similar approach commends itself to determining the extent to which a prior inconsistent statement has been corroborated. A prior inconsistent statement for which substantial evidence exists corroborating any of its specific elements and enhancing its seeming reliability is corroborated in its entirety and may be used for all purposes.

■ We do not believe it necessary to adopt a *per se* rule barring a conviction based solely on evidence obtained from a prior inconsistent statement.

> It is not critical that the factfinder have observed first-hand a witness's statement in order to evaluate its credibility and probative worth. Judge Learned Hand observed in *DiCarlo v. United States,* 6 *F.*2d 364, 368 (2d Cir.1925):
>
> > If, from all that the jury see of the witness, they conclude that what he says now is not the truth, but what he said before, they are none the less deciding from what they see and hear of that person and in court. There is no mythical necessity that the case must be decided only in accordance with the truth of the words uttered in court.
>
> Moreover, cross-examination plays the same role in the adversarial process whether the witness is a defendant, codefendant, accomplice, suspect, or a relative stranger to the criminal events. As the Appellate Division stated: "The out-of-court statement is ... subject to the scrutiny of cross-examination, which is recognized as the most effective means to test the truth of an out-of-court statement. 216 *N.J.Super.* at 109 [523 *A.*2d 212.] [*State v. A. Gross, supra,* 121 *N.J.* at 14, 577 *A.*2d 806 (other citations omitted).]

Trial courts engaging in the traditional admissibility and sufficiency inquiries found in the *Evidence Rule* 63(1)(a) context can adequately handle the potential difficulties noted in the *Orrico* line of cases.

■ Although evidence other than the statement tending to corroborate each element of each crime described in that statement certainly eases the resolution of those issues, such corroboration of each element of the crime is unnecessary as long as the statement is generally corroborated and its reliability is supported by the circumstances under which it was given. To ensure that, the defendant must have the opportunity to cross-examine the declarant, because cross-examination in the Rule 8 context may be the only method of bringing forth facts necessary for a fair assessment of the circumstances under which the statement was given and in the trial setting is the sole means by which the factfinder can assess the credibility of the prior statement and the recanting one. This Court's thirty-years experience with a similar approach under *Lucas* gives us confidence that that approach is realistic, workable, and fair. The factors outlined in *A. Gross, supra,* 121 *N.J.* at 10, 577 *A.*2d 806, establish a method for resolving such issues in the various factual settings presented by different cases. See *supra* at 248–49, 590 *A.*2d at 1115 (listing factors). In *State v. A. Gross, supra,* 121 *N.J.* at 12, 577 *A.*2d 806, we acknowledged that "the status of a witness is a highly relevant circumstance," but we saw no reason to subject such evidence to different tests turning on that status. The crucible of cross-examination reveals "most, if not all, relevant circumstances surrounding the prior inconsistent statement," regardless of the witness's status. *Id.* at 13, 577 *A.*2d 806 (citing cases). Although factor fifteen in *A. Gross* ("the presence or absence of corroborating evidence") may tip the balance one way or another in a close case, we see no reason to establish a rule that makes findings on the first fourteen factors an inconsequential prelude to a

determination of the entire issue based on the presence or absence of evidence corroborating each fact alleged in the statement.

We have found nothing untoward in allowing such a prior inconsistent statement, once subjected to such trials, to make up the bulk of (or the crucial link in) the substantive evidence of the crime. In *State v. A. Gross*, we found no problem with basing a conviction on a totally-recanted statement supposedly obtained through coercion, provided its reliability was sustained at a Rule 8 hearing. In *State v. F. Gross*, 121 *N.J.* 18, 577 *A.*2d 814 (1990), the Court affirmed a conviction on similar evidence. In *State v. Bryant*, the Appellate Division affirmed a conviction despite the fact that a prior inconsistent statement provided the *"only* evidence identifying defendant as one of the robbers." 217 *N.J.Super.* at 75, 524 *A.*2d 1291 (emphasis added). Of course, the reliability of each of the prior inconsistent statements in those cases had been corroborated by independent evidence.

## B.

■ We turn now to application of our standard to this case. Despite defendant's allegation, the reliability of Bernadette Hohney's prior inconsistent statement has substantial corroborative support going to the very substance of one of the crimes charged. She stated that Mancine had hired an assailant because Mullin had threatened to burn down Mancine's bar. Mancine himself acknowledged this, saying to others that he would spend whatever money he had to get [Mullin] for burning down his bar. Others also mentioned enforcer fees ranging from "his last penny" to $10,000. Hohney herself testified that Mancine had told her that someone was going to shoot Mullin. She also testified that "parts [of her June 27, 1986 statement] were true." That a jury latched onto different parts of these statements is within its power.

The June 27th statement carries with it intrinsic and extrinsic indicia of reliability apart from the substance it contains. It

was made two days after Raymond Mullin's death rather than when Hohney arrived at the police station with defendant minutes after she found out that her long-time lover had died. Trial testimony and the court's comments noting the "casual," easy "flow" of the June 27th statement contrasted starkly with the halting emotion of the June 25th statement. Moreover, the later statement is simply a more complete version of a story that Hohney began to tell on June 25, 1986. She mentioned in that first statement that she had heard that someone had come into the bar discussing the potential shooting of Raymond Mullin. On June 27th, she was more forthcoming and said that she saw the discussion take place. A supplement after two days seems more indicative of reliability than a recantation on trial's eve two years after the crime and her reconciliation with defendant.

Finally, the coercive tactics and status associated with findings of unreliability are not present here. Hohney was not then, nor was she ever, a suspect. The trial court rejected her allegations that she was forced to make certain statements in favor of more-credible testimony by the investigating officer that such coercion never happened. The trial court found the June 27th statement to have been made under circumstances establishing its reliability, and characterized much of her trial and Rule 8 testimony as "preposterous," noting that it "doesn't flow in any way." The court understood that its duty in the Rule 8 setting on a *Evidence Rule* 63(1)(a) statement was "to hear the entire context and make a determination as to whether I believe her testimony today, for example, as to the surrounding circumstances of the statement of June 27th." In believing the investigating officer after observing each witness and in giving credence to corroborative evidence, the court did just that.

■ The trial court properly sustained Mancine's convictions on both counts as being based on sufficient evidence. An approach to corroboration analogous to the one used in *DiFris-*

*co* and *Lucas* has been satisfied here. A court need be convinced only that a statement can reliably be used to affix criminal responsibility—corroborative evidence need not tack down each and every fact and allegation uttered in a prior inconsistent statement. *See State v. Bryant, supra,* 217 *N.J. Super.* at 75, 524 *A.*2d 1291 (allowing conviction to stand despite lack of anything other than prior inconsistent statement linking defendant to the crime); *cf. State v. Lucas, supra,* 30 *N.J.* at 58, 152 *A.*2d 50 (noting that the corroboration requirement cannot be overly exacting because "safeguards for the accused should not be turned into obstacles whereby the guilty can escape punishment").

■ We repeat our concerns with regard to the jury's use of such evidence in certain cases. Special precautionary instructions should be given to the jury to emphasize the unusual care that must be taken before convicting a defendant of a particular offense based solely on a recanted out-of-court prior inconsistent statement. Courts also should review carefully the evidence presented to determine in each case whether the reliable, generally-corroborated statement submitted by the prosecutor contains sufficient evidence on each element of the offense. If there is insufficient evidence then, of course, the court should grant a defendant's motion for acquittal.

■ Here, the record discloses that the evidence was sufficient to support defendant's convictions. Moreover, the jury instructions were adequate, for this was a case in which the witness was neither a suspect, target, nor potential codefendant. *See State v. F. Gross, supra,* 121 *N.J.* at 30, 577 *A.*2d 814 (noting the need for "particularized instructions" when a conviction would rest on a "prior inconsistent custodial statement of [a] suspect-declarant"). The trial court's instruction, in specifically calling the jury's attention to the assessment of witnesses' prior inconsistent statements and their explanations, if any, for such contradictions as well as a consideration of a witness's interest in the outcome of the case, "was generally

sufficient to focus its attention on the need to be especially careful in assessing the believability and worth of [the witness's] prior statement." *State v. A. Gross, supra,* 121 *N.J.* at 17, 577 *A.*2d 806.

We conclude that the substantive elements of a criminal charge may be proven through a prior inconsistent statement alone, provided that the statement was made under circumstances supporting its reliability and the defendant has the opportunity to cross-examine the declarant. For a statement that meets the requirements of *Evidence Rule* 63(1)(a) and one that after a Rule 8 hearing the court, in evaluating the *A. Gross* factors, finds by a preponderance of evidence to be reliable, evidence directly or indirectly corroborative of the substantive facts is helpful but not necessary. A court should weigh substantive evidence found in a prior inconsistent statement on the same scale as any other evidence when determining whether sufficient evidence to support a guilty verdict exists.

### III

We now consider the next issue, namely, can a conviction for aggravated manslaughter stand if the defendant was not indicted for aggravated manslaughter and if the aggravated-manslaughter charge was allegedly predicated on a different factual theory from that presented by the prosecution? Mancine contends that to cast him in the role of a hirer of ruffians when the indictment made no mention of that possibility was unfair. We reject Mancine's argument as an overly-mechanical one that ignores accepted principles of accomplice liability and unnecessarily narrows the meaning of "lesser-included offense."

It is well-settled law in this state that one indicted as a principal may be found guilty as an accomplice if the evidence produced at trial supports that finding. *State v. Schmidt,* 110 *N.J.* 258, 263, 540 *A.*2d 1256 (1988) (stating that "it has never been thought necessary specifically to charge an

individual as an aider or abettor in order to establish his substantive liability as an accomplice"); *State v. Boyer,* 221 *N.J.Super.* 387, 402, 534 *A.*2d 744 (App.Div.1987) (trial court may charge jury on accomplice liability even if indictment did not expressly allege accomplice liability under *N.J.S.A.* 2C:2–6; as long as there is a rational basis in evidence for accomplice liability, the record will justify a jury instruction on that theory); *State v. Hakim,* 205 *N.J.Super.* 385, 388–89, 501 *A.*2d 159 (App.Div.1985) (reaching same conclusion). Because evidence was produced throughout this trial (and indeed out of defendant's own mouth) regarding a possible hired assailant, Mancine suffered no surprise when he was charged on the theory that he acted as a principal as well as on the theory that he acted as an accomplice. The indictment as a principal of the murder left him susceptible to a guilt verdict as an accomplice.

From the record presented at trial, aggravated manslaughter arose as a possible lesser-included offense of accomplice-liability murder. Under *N.J.S.A.* 2C:1–8d, an offense includes the lesser offense if:

(1) It is established by proof of the same or less than all the facts required to establish the commission of the offense charged; or

(2) It consists of an attempt or conspiracy to commit the offense charged or to commit an offense otherwise included therein; or

(3) It differs from the offense charged only in the respect that a less serious injury or risk of injury to the same person, property or public interest or a lesser kind of culpability suffices to establish its commission.

This record contained evidence sufficient for a jury to find that Mancine intended the death of Mullin; however, it also contained evidence sufficient for a jury to find that he merely wanted Mullin injured (although Mancine appeared indifferent as to whether or not Mullin's injuries would prove fatal). The essential difference between each finding would involve the jury's determination of Mancine's culpability. Aggravated manslaughter, as found by this jury, fell within subsection (3).

Since Mancine could be charged as an accomplice or as a principal in the murder in the absence of an indictment specifically differentiating these theories, the court could charge

aggravated manslaughter as a lesser-included offense of the accomplice-liability charge. *See State v. Powell, supra,* 84 *N.J.* 305, 419 *A.*2d 406. The trial court charged murder not only on the theory that Mancine had shot Mullin but on an accomplice-based theory that Mancine had hired the shooter to kill Mullin. It then charged on aggravated manslaughter. We will not disturb a conviction based on a theory supported by the record, charged by the court and actually accepted by the jury. *See State v. Schmidt, supra,* 110 *N.J.* at 263–64, 540 *A.*2d 1256 (holding that a defendant cannot be found liable as an accomplice unless the jury was charged on and considered that theory).

The record developed through discovery and trial supported each theory presented and each offense charged by the trial court. That Mancine was not caught off guard by the jury charges on the accomplice-based theory of murder or the jury charges on aggravated manslaughter adds further support to our decision. Like the defendant in *State v. LeFurge,* 101 *N.J.* 404, 502 *A.*2d 35 (1986), Mancine must have learned of the possibility of a hired-gunman theory through pretrial discovery. As the Appellate Division noted, "undoubtedly defendant received the statements [made by Hohney] through discovery as well as a list of witnesses among whom were persons that testified that defendant had, on several occasions, threatened to pay someone to take care of the victim." 241 *N.J.Super.* at 183, 574 *A.*2d 525. Like the defendant in *State v. Talley,* 94 *N.J.* 385, 466 *A.*2d 78 (1983), Mancine must have been alerted through his own testimony to the possibility of this charge. Like the defendant in *State v. Lamb,* 125 *N.J.Super.* 209, 310 *A.*2d 102 (App.Div.1973), Mancine has made no claim of surprise or prejudice, he raised no objection at trial, he did not seek dismissal of the indictment before the trial, he did not object as the proofs unfolded, and he argued this point only in a motion for a new trial and on appeal. *Id.* at 216, 310 *A.*2d 102 (holding that defendant's ability to prepare a defense was not impaired although the "case as tried differed factually from the precise

language of the indictment"). In fact, in his closing argument, defense counsel emphasized that the State had two "alternative" theories in an attempt to raise reasonable doubt in the minds of the jurors. Mancine certainly had adequate notice to prepare a defense to both the accomplice-liability murder charge and its lesser-included aggravated manslaughter charge.

In considering whether the aggravated-manslaughter charge was a lesser-included offense, we "should not be diverted by a mechanistic test that simply" lists and matches so-called necessary facts. *State v. LeFurge, supra,* 101 *N.J.* at 422, 502 *A.*2d 35. Looking at the totality of the circumstances, the hired-gunman-murder theory and aggravated manslaughter were properly charged by the trial court in addition to the indicted murder charge. The murder and aggravated-manslaughter charges stem from the same criminal episode: the June 24, 1986 homicide of Raymond Mullin, Jr. If Mancine had not taken that extra step of hiring someone else, and if he had recklessly shot at Mullin intending only to hurt him, but had killed him, then, certainly aggravated manslaughter would be a lesser-included offense of murder. That he distanced himself from the crime should not enable him now to claim that aggravated manslaughter is not a lesser-included offense of murder.

## IV

Mancine's final contention is that he should not have been sentenced under the Graves Act because another criminal actor, not he, committed the crime by using a firearm. As the Appellate Division noted in another case:

> A defendant is subject to the Graves Act if in the course of commission of one of the enumerated offenses, including flight from the scene where that offense has been committed, he is in actual possession of a firearm (*State v. Des Marets,* 92 *N.J.* 62 [455 *A.*2d 1074] (1982)), if he is in constructive possession, that is, able practically immediately to obtain actual possession (*State v. Stewart,* 96 *N.J.* 596 [477 *A.*2d 300] (1984)), or if he is an accomplice in an other's [sic] physical possession of a firearm (*State v. White,* 98 *N.J.* 122 [484 *A.*2d 691] (1984)).

[*State v. Wooters,* 228 *N.J.Super.* 171, 175, 549 *A.2d* 441 (1988).]

Because Mancine is clearly an accomplice of the actual shooter under *N.J.S.A.* 2C:2–6c(1)(a), the Graves Act applies to him. Were it otherwise, the Graves Act would have the unintended result of allowing the mastermind of an armed assault to avoid a Graves Act sentence. *Cf. State v. Weeks,* 107 *N.J.* 396, 400, 526 *A.2d* 1077 (1987) (holding that Legislature could not have intended "that the mastermind of an armed robbery could avoid a Graves Act sentence by having a confederate carry the gun").

## V

In conclusion, we hold that Bernadette Hohney's prior inconsistent statement was sufficiently corroborated by other evidence in the case. Moreover, the circumstances under which it was given lend support to its reliability. Further, we believe that Mancine's claims regarding his indictment and jury charge lack merit. Accordingly, the judgment of the Appellate Division is affirmed in part and reversed in part. We affirm defendant's conviction for aggravated manslaughter and we reverse the Appellate Division judgment vacating his conviction for tampering with a witness.

HANDLER, J., concurring.

The Court upholds defendant Robert J. Mancine's conviction for aggravated manslaughter. I concur fully in its reasoning and judgment with respect to that conviction. The Court also upholds defendant's conviction for tampering with a witness, supported solely by the recanted prior inconsistent statement of his girlfriend, Bernadette Hohney. I concur as well in that determination. The Court, finding that the reliability concerns generated by prior inconsistent statements "shadow" those of confessions, *ante* at 250–251, 590 *A.2d* at 1116, adopts a test for such statements similar to the one it has used in evaluating the reliability of confessions. The Court holds that "[a] prior inconsistent statement for which substantial evidence exists corroborating any of its specific elements and enhancing its

seeming reliability is corroborated in its entirety and may be used for all purposes." *Ante* at 251, 590 *A.*2d at 1117. Because parts of Hohney's recanted statement were corroborated by other evidence, and because the statement "carrie[d] with it intrinsic and extrinsic indicia of reliability apart from the substance it contains," the Court concludes that the statement in its entirety is sufficiently reliable to stand as the sole support of defendant's tampering conviction. *Ante* at 253–256, 590 *A.*2d at 1118–1119. Although I agree in general with the Court's test to determine the admissibility and use of prior inconsistent statements, I am troubled by the analytical route it follows to reach that result. I write separately, therefore, to differentiate my endorsement of using that test to determine the admissibility and use of prior inconsistent statements from my disapproval of using that test to determine the admissibility and use of confessions. See *State v. DiFrisco,* 118 *N.J.* 253, 289–98, 571 *A.*2d 914 (1990) (Handler, J., concurring in part and dissenting in part).

The Court has previously "determine[d], as a matter of law, that no presumption of unreliability attaches to ... prior inconsistent statements that requires a special or heightened burden of proof." *State v. A. Gross,* 121 *N.J.* 1, 15, 577 *A.*2d 806 (1990). I therefore find unobjectionable a rule by which a prior inconsistent statement may, on its own, support a criminal conviction, so long as substantial evidence corroborates the statement at least in part, and the circumstances in which the statement was given support its reliability. Confessions, by contrast, have long been regarded as generally suspect. *Smith v. United States,* 348 *U.S.* 147, 153, 75 *S.Ct.* 194, 197, 99 *L.Ed.* 192, 198–99 (1954); *State v. DiFrisco, supra,* 118 *N.J.* at 278–79, 571 *A.*2d 914; *State v. Lucas,* 30 *N.J.* 37, 51, 152 *A.*2d 50 (1959). Thus, "[i]t is a widely accepted doctrine ... that an uncorroborated extra-judicial confession cannot provide the evidential basis to sustain a conviction for a crime." *State v. Lucas, supra,* 30 *N.J.* at 51, 152 *A.*2d 50. The foundation of the corroboration rule

lies in a long history of judicial experience with confessions and in the realization that sound law enforcement requires police investigations which extend beyond the words of the accused. Confessions may be unreliable because they are coerced or induced, and although separate doctrines exclude involuntary confessions from consideration by the jury, further caution is warranted because the accused may be unable to establish the involuntary nature of his statements. Moreover, although a statement may not be "involuntary" within the meaning of this exclusionary rule, still its reliability may be suspect if it is extracted from one who is under the pressure of a police investigation—whose words may reflect the strain and confusion attending his predicament rather than a clear reflection of his past. Finally, the experience of courts, the police and the medical profession recounts a number of false confessions voluntarily made.

[*Smith v. United States, supra,* 348 *U.S.* at 153, 75 *S.Ct.* at 197, 99 *L.Ed.* at 198–99 (citations omitted).]

For those reasons, this Court has recognized that "[n]o greater burden should be required of the State than independent corroborative proof tending to establish that when the defendant confessed he was telling the truth...." *State v. Lucas, supra,* 30 *N.J.* at 58, 152 *A.*2d 50. That burden encompasses the need for corroborative evidence of both the confession itself and the commission of the crime. *Ibid.*

In *State v. DiFrisco,* although a majority of the Court endorsed the corroboration rule and its rationale, it eviscerated the rule by effectively holding that even though the crime is *not* corroborated, the *whole* of the confession is deemed reliable if *some* of the confession is corroborated. See 118 *N.J.* at 269–80, 571 *A.*2d 914. In *DiFrisco,* a capital-murder case, the defendant confessed that he committed a murder and that he was hired to commit that murder by one Franciotti. The latter aspect of the crime, the hiring, constituted an aggravating factor that was the functional equivalent of the crime of capital murder. There was, however, no extrinsic evidence of that criminal arrangement. The Court nonetheless found the confession sufficient to support the murder-for-hire aggravating factor, which the trial court had ultimately used to sentence the defendant to death. The Court, in sustaining that use of the confession, stated: "[w]hen there is no extrinsic evidence of the aggravating factors themselves, the [finder of fact] must be

satisfied beyond a reasonable doubt that the confession itself is
sufficient to establish the aggravating factors beyond a reason-
able doubt." *Id.* at 275, 571 *A.*2d 914.

The Court, in my view, so diluted the requirement of extrinsic
crime corroboration as effectively to eliminate it. I wrote:

[T]he Court departs from the traditional corroboration rule, which, as noted,
entails some degree of both independent evidence of the underlying crime and
independent evidence that bolsters the trustworthiness of the confession.

\* \* \* \* \* \* \* \*

It is evident that the Court understands that its new corroboration rule
tolerates only a shred of evidence as sufficient to authenticate what otherwise
would unquestionably be a legally insufficient confession.

[*Id.* at 293, 294, 571 *A.*2d 914 (Handler, J., concurring in part and dissenting in
part) (citation omitted).]

I believed in *DiFrisco,* and continue to believe, that the use of
that diluted corroboration test as applied to confessions is both
unprincipled and unacceptable. See *id.* at 294, 571 *A.*2d 914.

The Court in this case homogenizes confessions and prior
inconsistent statements. I see no necessity to equate for
evidentiary purposes admissions of guilt by an accused and
incriminating statements by a witness nor to fashion an identi-
cal test to determine their respective admissibility and probative
worth to establish criminal guilt. We have, as noted, concluded
that, unlike confessions, "no presumption of unreliability at-
taches to ... prior inconsistent statements." *State v. A. Gross,*
*supra,* 121 *N.J.* at 15, 577 *A.*2d 806. We have prescribed a
comprehensive and stringent standard to determine the admissi-
bility of a recanted prior inconsistent statement. That stan-
dard, in my opinion, is sufficiently protective of the rights of
criminal defendants and does not pose intolerable risks that a
defendant's conviction will be based on intrinsically unreliable
evidence. The test that the Court now applies to prior incon-
sistent statements conforms to that standard. I repeat, how-
ever, that the justification for that test should not depend on its
improvident application to confessions.

Thus, in all respects save its endorsement of and reliance on
*DiFrisco,* I join the Court's opinion.

STEIN, J., concurring.

I join the Court's opinion. I write separately only on the issue of whether defendant's conviction of aggravated manslaughter can be sustained, defendant having argued that that conviction was premised on different facts from the offense of murder for which he was indicted. The majority upholds that conviction, reasoning that because the trial court properly charged the jury that defendant, by virtue of his indictment for murder, could alternatively be convicted of murder as an accomplice, *N.J.S.A.* 2C:2–6b(3), *see State v. Boyer,* 221 *N.J.Super.* 387, 402, 534 *A.*2d 744 (App.Div.1987), aggravated manslaughter therefore could be charged to the jury as a lesser-included offense, *N.J.S.A.* 2C:1–8d, of accomplice-liability murder. *Ante* at 257, 590 *A.*2d at 1120.

I agree with the Court's holding sustaining the aggravated-manslaughter conviction, but would arrive there by a slightly different route. In my view, the lesser-included offense provision of the Code of Criminal Justice, *N.J.S.A.* 2C:1–8d, permits a defendant to be convicted of "an offense included in an offense charged," meaning that the statutory definition of an "included offense" refers back to the offense for which defendant was indicted, in this case murder. *See State v. LeFurge,* 101 *N.J.* 404, 419, 502 *A.*2d 35 (1986). Hence, as the majority opinion tacitly acknowledges, the aggravated-manslaughter offense in this case was not a lesser-included offense of murder, the indicted offense, because its factual predicate was entirely different. The evidence supporting the aggravated-manslaughter charge indicated that defendant hired someone to injure the decedent, and the murder indictment charged that defendant committed the homicide by his own conduct.

Nevertheless, there was clearly a rational basis in the evidence for the aggravated-manslaughter charge, and defendant, understandably, did not object to the trial court's proposed charge on aggravated manslaughter. As we noted in *State v. Sloane,* 111 *N.J.* 293, 300, 544 *A.*2d 826 (1988), the statutory

definition of lesser-included offenses is not "all-encompassing," nor are the statutory categories "water-tight compartments." *Sloane* suggests that in certain circumstances, subject to the requirements of fair notice, an offense not meeting the Code's definition of lesser-included offense should be charged to the jury if it is supported by the evidence. That principle "comports with our general view that subject to fair notice the jury should resolve the degree of an actor's guilt on the basis of the evidence presented to the jury." *Ibid.*

As the majority observes, defendant was not caught "off guard" by the jury charge on aggravated manslaughter, having undoubtedly been alerted through discovery and other evidence to the possibility that that offense could be developed by the proofs as an alternative to murder. *Ante* at 257–259, 590 *A.*2d at 1120–1121. As we observed in *LeFurge,* the principle that "an indictment must fairly apprise a defendant of the charges against him * * * [is] sufficiently flexible to accommodate the commonlaw doctrine that a defendant may be found guilty of a lesser offense included in the offense charged in the indictment." *State v. LeFurge, supra,* 101 *N.J.* at 419, 502 *A.*2d 35. That principle may also accommodate a charge on a related offense when, as in this case, defendant is not surprised and the charge on aggravated manslaughter obviously serves his interests. Under the circumstances, not only was that charge appropriate, its omission may well have constituted reversible error. That the theory of aggravated manslaughter on which defendant was convicted was not a statutorily-defined included offense of the indicted murder offense does not under these circumstances affect the validity of defendant's conviction.

HANDLER and STEIN, JJ., concurring in the result.

*For affirmance in part and reversal in part*—Chief Justice WILENTZ, and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*Opposed*—None.